# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 17, 2010

No. 09-50232

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

GERARDO TREJO,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No 3:06-CR-2506-1

Before DeMOSS, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Gerardo Trejo challenges the constitutionality of a warrantless entry into and search of his home, which yielded evidence leading to the present conviction. For the reasons stated herein, we affirm the district court's denial of Trejo's motion to suppress and consequently affirm the conviction.

## I. FACTS AND PROCEDURE

Trejo was arrested and indicted for possession with intent to distribute in excess of 100 kilograms of marijuana. The marijuana was found by officers of

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-50232

the Texas Department of Public Safety (DPS) in Trejo's home. Trejo challenged whether the DPS officers' conduct leading to the discovery of the drugs violated his Fourth Amendment rights. Trejo moved to suppress the physical evidence and certain statements he made. The following facts were adduced at a hearing before the district court, at which several of the arresting officers, and Trejo himself, testified.[1]

## A. The Tip and the Bust

On November 6, 2006, Eduardo Garza, a highly experienced narcotics sergeant with the DPS, received a tip that a Ford van with temporary tags was carrying "a large quantity of marijuana." Garza had received information from the same tipster on previous occasions. The van was located in a Home Depot parking lot in El Paso. Garza observed that it was weighted down in the back. At 11:54 a.m., officers saw a Hispanic man get in the van and drive away. The man was never identified. Air surveillance followed the van to a nearby house, which was later determined to be Trejo's. There were no passengers in the van.

When the van reached the house it pulled into an attached garage. Officers had maintained air surveillance on the van and directed officers on the ground to the house. Garza drove by the residence while the van was still in the garage. He testified that the residence appeared vacant: it was "unkempt," there was trash in the yard, and the lawn was "neglected." This was in contrast to the neighboring houses on the street. Based on the appearance of the residence, as well as the tip and the fact that the heavily laden van entered the garage, Garza

---

[1] The testimony of the officers presented some internal contradictions and conflicted at times with Trejo's testimony. Upon reviewing the record, including the hearing transcript, we are confident that the district court's resolution of inconsistencies and credibility questions was not clearly erroneous. Consequently, we recount the facts largely as found by the district court, with all inferences taken in favor of the prevailing party in the district court, in this case, the government. *See United States v. Menchaca-Castruita*, 587 F.3d 283, 289 (5th Cir. 2009) (citation omitted).

2

surmised that the residence could be a "stash house" for drugs and that the van was delivering a load of narcotics.

About 25 minutes after the van pulled into the garage, it left, followed by Garza and other officers. The same person appeared to be driving the van, and it no longer seemed weighted down. The officers followed the van but lost it in traffic. Air surveillance also lost the van, so the ground officers returned to the residence and resumed surveillance.

At 5:50 that night, when it was dark, a white SUV arrived at the residence and drove into the garage. Officers were unable to ascertain whether the SUV had any passengers, nor could they identify the driver. Officers also could not see whether a second vehicle was in the garage. The garage door closed, and the front porch light came on, as did lights within the residence. At 6:50, officers decided that allowing more time to pass without taking action was risky. They did not know if another vehicle might arrive, which could pose a threat to officers' safety or raise the prospect of monitoring multiple locations or vehicles. They approached the house to conduct a "knock and talk," in hopes of obtaining consent to search it. Garza testified that he did not seek a warrant at that time because he did not believe he had probable cause.

Garza approached the house with DPS Sergeants Val Ceniceros and Efren Martinez, both highly experienced in narcotics detection and interdiction. To ensure officer safety, standard practice called for officers to conduct knock and talks in groups of two or more. Additionally, four more DPS officers stood at the northeast corner of the house, two officers were at the northwest side of the house, and one officer was near the garage. A canine officer was on the sidewalk in front of a nearby house. The house is fenced at the sides and rear by a four-foot high rock wall. A gate at the east side of the house stood ajar, but the officers stationed there did not initially enter the backyard.

No. 09-50232

Garza, Ceniceros, and Martinez went to the front door of the house. They wore windbreakers that identified them as police, and their badges were visible. The officers wore their firearms, but did not display them as they approached the house. Garza rang the doorbell, and he could hear it, but no one came to the door. Martinez knocked on the door "for approximately a minute and a half," but to no avail. Garza and Ceniceros both testified that they smelled marijuana as they were standing at the front door. Martinez smelled fabric softener—which he knew to be employed as a masking agent to cover up the smell of drugs.

While Martinez was knocking, Ceniceros went to the east side of the house. On that side is a sliding glass door, which is visible from outside the rock wall enclosing the side and backyard. However, officers could not see through the door because there were vertical blinds in the closed position. Ceniceros testified that a man, whom he identified in court as Trejo, pushed the blinds aside and looked outside. Upon seeing the officers, Trejo hastily retreated toward the rear of the house. Ceniceros was concerned that the police had blown their cover and that the man would abscond, destroy evidence, retrieve a weapon, or alert others to the officers' presence, endangering their safety. Ceniceros pursued the man in the direction he had seen him exit; he passed through the gate into the backyard and attempted to look through a window of the southeast bedroom. The light in the room was not on, but the hallway light was on, providing some illumination. The curtains on the window were closed, but a gap permitted Ceniceros to look in the room, where he saw a person whom he was unable to identify, as well as many boxes.

The officers at the east side of the house told Garza that someone looked out the sliding glass door and then ran toward the back of the house. Hearing this, Garza went to the east side of the house and into the backyard. There he encountered Ceniceros, who informed Garza about the person and the boxes in the southeast bedroom. Garza looked through the southeast bedroom window.

4

He didn't see a person, but did see several boxes packaged with tape. Based on his counter-narcotics experience, he believed that the boxes could contain drugs. Garza next went to a window for the southwest bedroom of the house to look for an exit, the person spotted by officers, or additional persons in the house. The blinds in this window were closed, but Garza testified that a crooked blind allowed him to see into the room. He testified that he saw more boxes of what he suspected were drugs.[2] Garza instructed Ceniceros to stay in the backyard to "make sure nobody came out the window." Garza went back to the east side of the house and informed the officers there that he knew of at least one person's presence in the house, but did not know if more were inside.

Approximately three minutes after leaving the front door area, and five minutes after first knocking, Garza returned to the front door and knocked again. Martinez heard a muffled voice from inside. Martinez announced: "State police, please open the door." Trejo complied. When the door opened, Garza and Martinez immediately noticed a strong smell of marijuana. Although it was a cold day in November, Trejo was "sweating profusely." Martinez and Garza identified themselves as state police and told Trejo that they were investigating information that narcotics may be located at the residence. Trejo did not respond, but walked slowly toward the officers onto the porch. Trejo appeared submissive to the officers; Martinez said that Trejo had a "deer in the headlights look." Consequently, the officers did not believe that he posed a threat, and did not frisk Trejo for a weapon. Trejo responded negatively when Martinez asked whether there was anyone else in the house. Martinez then stated that he and Garza wished to go inside to check for threats; Trejo told them to go ahead.

---

[2] The district court discredited Garza's testimony about seeing through the southwest bedroom window because other testimony indicated that the position of the blinds would have made it all but impossible for Garza to have seen boxes on the floor of the room.

No. 09-50232

Garza also explained that he and Martinez would do a protective sweep. Trejo responded: "I know who you guys are, and I know what I have."

Garza and Martinez conducted a 25-second protective sweep of the house, which involved checking each room. All of the bedroom and closet doors were open. Nobody else was in the house. Garza and Martinez observed several packaged boxes in two of the bedrooms. Upon hearing that Garza and Martinez had completed the protective sweep, Ceniceros left his position in the backyard.

Garza returned to Trejo, who was still standing outside the front door, and asked if they could discuss matters inside the house, as the neighbors were watching. Trejo consented to the officers entering the house. Garza, Martinez, and several other officers went inside, and were soon joined by Ceniceros. Although the officers had spoken English to Trejo, which he understood, Trejo indicated that he preferred to speak Spanish. Trejo refused when Ceniceros asked for consent to search the house. When asked to sign a consent form, Trejo said: "I'm not going to sign it, you guys already know what's in there." When Trejo was informed that officers would get a search warrant if he refused consent, he replied "[t]hat's fine." Garza left the house to obtain a search warrant. On the way out, he encountered the canine officer, and learned that the dog had alerted to the presence of narcotics in the garage. The remaining officers exited the house around 7:30. They handcuffed and detained Trejo out front while waiting for the warrant.[3]

---

[3] Although Trejo testified, the district court did not find his version of the events credible. Trejo testified as follows: he was in the southeast bedroom watching television when he was startled by loud knocking at the sliding door and the front door simultaneously. Someone shined a light into the bedroom. He went to the front door and opened it 60 to 90 seconds after the knocking started. He never heard the doorbell ring. Garza, Ceniceros, Martinez, and one other person immediately entered the house. Garza physically pulled Trejo onto the front porch and asked if he was alone while the other officers were inside the house. The officers did not identify themselves nor ask whether they could make a protective sweep of the house for their own safety. Trejo stayed outside the house for 15-20 minutes, until the officers exited it. According to Trejo, if he was sweating when he answered the door, this was

No. 09-50232

Garza drafted an affidavit detailing his observations of the van and house that day, the circumstances of the knock and talk, the officers' ability to smell marijuana from the front porch, Garza's view of the packages from the backyard and during the protective sweep, Trejo's conduct and statements, and the canine alert to marijuana. Based upon the affidavit, a warrant was issued at 1:35 a.m. the next morning. When the warrant was executed officers found 43 boxes containing approximately 755 kilograms of marijuana. Following this discovery, Trejo was arrested and questioned. He then made an incriminating written statement.

### B. The Motion to Suppress and Conviction

Trejo moved to suppress the marijuana obtained from his residence. He argued that: (1) the officers' entry into the backyard was unlawful because there were no exigent circumstances not of the officers' own making; (2) he did not consent to the officers' entry into the house; and (3) the officers' entry was not justified as a protective sweep. He contended that his arrest was illegal, and therefore that his post-arrest incriminating statement should be suppressed.

The district court denied the motion. It found that the officers had probable cause to enter the backyard of the house in light of the tip, the van arriving at the house and leaving again unladen, the unkempt appearance of the house, Trejo's failure to answer the door, the smell of marijuana, and the appearance and immediate flight of a person at the sliding door. The court found that the potential that Trejo could flee, harm the officers, or destroy evidence gave rise to exigent circumstances. The court found the officers' investigative tactics reasonable, including the decision to watch the house and then conduct a knock and talk. The exigent circumstances were caused by Trejo's unusual reaction to the knock and talk, and were not "manufactured" by the officers'

---

due to the chores he had performed between 5:00 and 6:00 that evening. He denied looking through the sliding glass door, and he denied taking five minutes to answer the front door.

actions. Because the officers were justified in entering the backyard, they were likewise allowed to look into the windows under the plain view doctrine. Moreover, Trejo consented to the officers' entry to conduct a protective sweep. The court next found that the affidavit underlying the search warrant, resulting as it did from lawful actions by the officers, provided adequate probable cause. Any misstatements in the affidavit did not undermine its validity. Finally, the court held that Trejo's pre- and post-arrest statements were not improperly elicited. Therefore, the marijuana and Trejo's statements were admissible.

Following the denial of the motion to suppress, Trejo consented to a bench trial on stipulated facts in order to preserve his Fourth Amendment challenge for appeal.[4] The court found Trejo guilty of all elements beyond a reasonable doubt. Trejo was sentenced to seventy months' imprisonment.

## II. DISCUSSION

In this appeal, Trejo challenges the district court's denial of his motion to suppress the marijuana found in his home as well as his incriminating statements to the officers. He avers that the officers lacked probable cause and exigent circumstances before approaching his home and entering his backyard. He says that if exigent circumstances were present, these were manufactured by the officers' knock and talk. Trejo also argues that the district court clearly erred in finding that he consented to the officers' protective sweep of the house, that the court clearly erred in finding his admissions to the officers voluntary, and that the search warrant was invalid.

A warrantless search of a home or its curtilage is presumptively unreasonable under the Fourth Amendment. *United States v. Troop*, 514 F.3d 405, 409-11 (5th Cir. 2008). However, the search is permissible if the

---

[4] Trial was delayed because Trejo absconded to Mexico for approximately twenty months. Trejo voluntarily returned and relinquished himself to authorities, whereupon legal proceedings resumed.

homeowner consents, or probable cause and exigent circumstances are present. *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007). The government bears the burden of showing exigent circumstances. *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006) (citation omitted). We review a district court's factual determinations concerning a motion to suppress for clear error. *Id.*

Here, the district court examined whether the facts and circumstances of this case gave rise to exigent circumstances. However, we do not think it necessary to engage in this inquiry. The officers made a warrantless entry into Trejo's backyard to ensure that he did not abscond, destroy evidence, or retrieve a weapon. Even assuming, *arguendo*, that this violated Trejo's rights under the Fourth Amendment, the officers subsequently obtained Trejo's consent to conduct a protective sweep of the interior of the home. "When a person gives consent to search, that consent may, but does not necessarily, dissipate the taint of a prior Fourth Amendment violation." *United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002) (quotation and citation omitted). For the evidence to be admissible, consent must be voluntarily given, and such consent must be an independent act of free will. *Id.* "The first prong of this inquiry focuses on coercion, the second on causal connection with the constitutional violation." *Id.* (quotation and citation omitted).

## A. Voluntariness of Consent

The consent exception to the warrant requirement requires the government to show, under a totality of circumstances, that the defendant's consent to search was voluntarily given. *United States v. Freeman*, 482 F.3d 829, 831-32 (5th Cir. 2007). In evaluating voluntariness, we consider six factors: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5)

the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *Gomez-Moreno*, 479 F.3d at 357 n.5. "No single factor is dispositive." *Id.* The voluntariness of consent is a question of fact reviewed for clear error. *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002).

Trejo has not shown that the district court clearly erred in finding that he voluntarily consented to the protective sweep. Concerning the first factor, when Trejo opened the door, the officers did not place him in police custody; rather, he voluntarily walked toward them onto the front porch. He was not restrained during the protective sweep. Under the second factor, the police procedures were not unduly coercive: the officers at the door knocked and requested that Trejo open the door. Other officers secured the periphery of the home. The officers then asked if they could conduct a protective sweep; Trejo consented. The officers' tactics showed restraint and discipline, respecting the sanctity of the home. *See Payton v. New York*, 445 U.S. 573, 585 (1980) (stating that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed") (citation omitted). Third, Trejo cooperated with the police and answered their questions. The district court found that Trejo told Martinez to "go ahead" after Martinez asked if the officers could perform a protective sweep.

On the fourth factor, Trejo was evidently aware of his right to refuse consent: he did exactly that when, after the protective sweep, the officers sought to conduct a thorough search of the home. Next, for the fifth factor, there is nothing in the record to suggest that Trejo lacked the education and intelligence to comprehend the nature of the officers' actions. Rather, his statements evince an understanding of the situation. While he was more comfortable using Spanish, Trejo understood and initially communicated with the officers in English. Finally, Trejo appeared resigned to the fact that officers would find

incriminating evidence, yet still allowed the officers to conduct the protective sweep. In sum, all factors militate in favor of finding that Trejo voluntarily consented to the protective sweep. Trejo takes issue with the district court's rejection of his testimony concerning the events at his home. But this rejection was based on a credibility determination, which we see no occasion to second guess. *See, e.g.*, *United States v. Garza*, 118 F.3d 278, 283 (5th Cir. 1997). In sum, Trejo voluntarily consented to the officers' entry into his home to conduct the protective sweep.

## B. Independent Act of Free Will

"To determine whether the defendant's consent was an independent act of free will, breaking the causal chain between the consent and the constitutional violation, we must consider three factors: 1) the temporal proximity of the illegal conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and the flagrancy of the initial misconduct." *Hernandez*, 279 F.3d at 307 (citations omitted).

Mere minutes separated the allegedly illegal entry into Trejo's backyard and the officers' efforts to gain Trejo's consent to conduct a protective sweep. The first factor weighs in favor of suppression. However, while some officers entered the backyard to ascertain that Trejo was not trying to flee, destroy evidence, or obtain a weapon, other officers remained on the porch to pursue the knock and talk strategy. Trejo came to the door of his own accord, emerged onto the porch, and allowed the officers to enter his home. The officers' execution of this permissible strategy was an intervening circumstance. *See United States v. Jones*, 239 F.3d 716, 720-21 (5th Cir. 2001) (recognizing that knock and talk may be a reasonable tactic when officers suspect drug-related activity but do not have probable cause). Finally, the officers' entry into Trejo's backyard was a mere breach of the home's curtilage, not a full-scale storming of the home's interior. We thus cannot consider the officers' actions flagrant misconduct. *See*

No. 09-50232

*Payton*, 445 U.S. at 585; *Hernandez*, 279 F.3d at 307.  The main purpose of the actions was not to raid the home to search for evidence, but to ensure officer safety.  *See Brown v. Illinois*, 422 U.S. 590, 603-04 (1975) (noting that the purpose and flagrancy of the official misconduct are "particularly" important).  On the whole, there is not a causal chain between the initial potentially illegal conduct and Trejo's act of free will allowing the officers into his home.  *See Hernandez*, 279 F.3d at 307.  Therefore, the officers' observations during the protective sweep were not gained in derogation of Trejo's rights under the Fourth Amendment.

## C. The Warrant Is Valid

Even if we purge from the warrant affidavit any information officers obtained as a result of the intrusion of Trejo's backyard, under the independent source doctrine, sufficient facts remain to constitute probable cause.  *See United States v. Hassan*, 83 F.3d 693, 697 (5th Cir. 1996) (citation omitted).  This includes the corroborated tip about the van, the van appearing to deliver a cargo to Trejo's house, the appearance of the house, the smell of marijuana and masking agents, the boxes observed during the protective sweep, and the canine's positive alert for the presence of narcotics.  *See United States v. Pierre*, 958 F.2d 1304, 1310 (5th Cir. 1992) (en banc) (reasoning that the smell of marijuana can give rise to probable cause).  Garza testified that he believed the officers had probable cause to seek a warrant after the officers smelled marijuana and the canine confirmed this observation.  In light of these facts, we easily conclude that the officers would have sought a search warrant even had they not observed boxes through the back windows of Trejo's house.  *See Hassan*, 83 F.3d at 697.

## D. Trejo's Statements, and the Marijuana, Were Admissible

Trejo also argues that the district court erred by failing to suppress the written and oral statements he gave officers as well as the physical evidence of

the search. Trejo's oral statements to the officers during the course of the knock and talk were admissible. Trejo was not in custodial interrogation because he had not been placed under formal arrest or a restraint tantamount to arrest when he told the officers he knew who they were and he knew what he had. *See United States v. Chavez*, 281 F.3d 479, 486 (5th Cir. 2002); *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc). Therefore, the fact that the officers did not administer a *Miranda* warning does not render this statement inadmissible. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

We have concluded that Trejo validly consented to the officers' protective sweep of his home, and that the officers' observations gave rise to probable cause upon which a valid warrant was issued. Therefore, we must reject Trejo's contention that his inculpatory written statement following execution of the warrant is fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963).[5] We likewise reject Trejo's argument that the marijuana discovered in his house was the fruit of an illegal search. *See id.* at 487-88.

### III. CONCLUSION

For the foregoing reasons, we hold that the district court properly denied Trejo's motion to suppress his statements and the marijuana discovered at his house. The judgment of the district court is AFFIRMED.

---

[5] Trejo acknowledges that he was administered, and waived, his *Miranda* rights prior to giving the written statement.