KATHLEEN CARDONE, UNITED STATES DISTRICT JUDGE
On this day, the Court considered Defendant Leon Fonseca's ("Defendant") Motion to Dismiss, ECF No. 15, in the above-captioned case. For the reasons set forth herein, the Motion is DENIED .
I. BACKGROUND
The following facts are alleged in Plaintiff Francisco Ramirez's ("Plaintiff") Original Complaint ("Complaint") and, at this stage in the proceedings, are accepted by the Court as true. See Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). On November 5, 2016, Plaintiff, who suffered from clinical depression, was taking a nap in his van, which was parked in the backyard of his home. Compl. ¶¶ 8-9. His estranged wife, Vanessa Duarte, who was living elsewhere at the time, came to his home and found him asleep in the van. Id. ¶ 9. Concerned about Plaintiff's mental state and worried he may harm himself, Ms. Duarte left the home and called 911 to request assistance for Plaintiff, whom she described as being suicidal and in need of help. Id. ¶¶ 9-10. Ms. Duarte did not allege that any crime had been committed. Id. ¶ 10.
Approximately two hours later, Defendant responded to the 911 call and parked in the driveway at the front of Plaintiff's home. Id. ¶ 11. Plaintiff, still in the backyard, was not visible from the front of the house. Id. Rather than knock on the front door or otherwise announce his presence to the residents of the home, Defendant opened a closed metal gate to gain access to the backyard without a warrant and without the consent of any resident of the property. Id. ¶¶ 11-13. Defendant searched the premises, again without a warrant or permission to search. Id. ¶ 15.
Defendant found Plaintiff alone in the backyard, sitting on the ground behind a "large van." Id. ¶ 14. Plaintiff was holding a "standard sized" box cutter, which was "small in length." Id. ¶ 15. When Defendant noticed the box cutter, he took cover behind a dumpster approximately eighteen feet from where Defendant sat. Id. At this point, Defendant was separated from Plaintiff by both the dumpster and the van. Id. The exit to the property was directly behind Defendant and was unobstructed, and two additional exit routes were readily accessible to Defendant. Id. ¶ 18.
Defendant removed his firearm from its holster, pointed it at Plaintiff, and began "screaming" orders at him. Id. ¶ 16. Confused, Plaintiff repeatedly asked Defendant to leave his home and leave him alone. Id. ¶ 17. In an attempt to make Defendant lower his weapon and leave, Plaintiff held the box cutter to his own throat and threatened to harm himself. Id. Plaintiff did not make any aggressive movements towards Defendant, and remained *672 approximately eighteen feet from Defendant while holding the box cutter to his own throat. Id. Plaintiff's brother, Javier Romero, entered the backyard and repeatedly asked Defendant to allow him to speak with Plaintiff to de-escalate the situation. Id. ¶ 20. Defendant refused to allow this, and instead pointed his gun at Mr. Romero.
Suddenly, and without provocation, Defendant fired several shots at Plaintiff. Id. ¶ 22. These initial shots missed. Id. Plaintiff, in fear for his life, ran away from Defendant to take cover behind his van. Id. ¶ 23. Defendant followed Plaintiff behind the van, where Plaintiff stumbled and fell. Id. Defendant then fired another shot at Plaintiff, which struck Plaintiff in the face as he lay on the ground. Id.
Defendant made no attempt to render aid to Plaintiff after shooting him in the face at close range. Id. ¶ 25. Approximately twenty minutes after the shooting, emergency personnel arrived and discovered Plaintiff lying on the ground, unconscious and bleeding. Id. ¶ 26. Plaintiff was found behind the van and approximately ten and a half feet from the dumpster that Defendant was hiding behind when he fired his first shots. Id. ¶ 24. Specifically, Plaintiff was found on the opposite end of the van from where the shooting began, and on the far side of the van from where Defendant stood before he began firing. Id.
Plaintiff was transported to the hospital, where he was found to have multiple exit and entry wounds to his face and body. Id. ¶ 24. As a result of the shooting, Plaintiff is now mostly blind in his left eye and has significantly impaired function in his right arm. Id. ¶ 27. Plaintiff also suffered deformities to his face and arm, and continues to experience significant physical and mental health problems due to his injuries. Id.
On January 26, 2018, Plaintiff filed suit in this Court against Defendant and the City of El Paso under 42 U.S.C. § 1983, stating claims for excessive force and unlawful entry. Id. ¶ 1. Defendant filed his Motion on June 4, 2018, asserting the defense of qualified immunity for both claims, and Plaintiff filed his Response, ECF No. 21, on June 30, 2018. Defendant filed his Reply, ECF No. 22, on July 9, 2018. The Motion is now ripe for consideration.
II. DISCUSSION
A. Standards
1. 12(b)(6)
A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint on the basis that it fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, the court must accept well-pleaded facts as true and view them in a light most favorable to the plaintiff. Calhoun v. Hargrove , 312 F.3d 730, 733 (5th Cir. 2002) ; Collins v. Morgan Stanley Dean Witter , 224 F.3d 496, 498 (5th Cir. 2000). Though a complaint need not contain "detailed" factual allegations, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly , 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks omitted) (quoting Papasan v. Allain , 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) ); Colony Ins. Co. v. Peachtree Constr., Ltd. , 647 F.3d 248, 252 (5th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal , 556 U.S. at 678, 129 S.Ct. 1937.
*673 "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly , 550 U.S. at 555, 127 S.Ct. 1955 ; Colony Ins. Co. , 647 F.3d at 252. Ultimately, the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level." Twombly , 550 U.S. at 555, 127 S.Ct. 1955 (internal citation omitted). Nevertheless, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.' " Id. at 556, 127 S.Ct. 1955 (quoting Scheuer v. Rhodes , 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) ).
2. Qualified Immunity
"The doctrine of qualified immunity shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." Goodman v. Harris Cty. , 571 F.3d 388, 395 (5th Cir. 2009) (quoting Wallace v. Cty. of Comal , 400 F.3d 284, 289 (5th Cir. 2005) ) (internal quotation marks omitted). Determining whether a party is entitled to qualified immunity is a two-step process: " '[T]he first step is to determine whether plaintiff alleged a violation of a clearly established constitutional right' and '[t]he second step requires determining whether ... the official's conduct was objectively reasonable under clearly established law existing at the time of the incident.' " Id. (second and third alterations in original) (emphasis omitted) (quoting Bazan ex rel. Bazan v. Hidalgo Cty. , 246 F.3d 481, 490 (5th Cir. 2001) ).
B. Excessive Force
Plaintiff alleges that Defendant "deprived [Plaintiff] of his rights under the Fourth and Fourteenth Amendment of the United States Constitution by intentionally using an objectively unreasonable and excessive amount of deadly force." Compl. ¶ 117. Defendant asserts that he is entitled to qualified immunity on this claim because Plaintiff has not shown that his conduct violated Plaintiff's clearly established constitutional rights or that the force he used was clearly excessive or objectively unreasonable. Mot. ¶ 18.
1. Defendant's use of force against Plaintiff violated a clearly established constitutional right
The Supreme Court has held that, where an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons ... against unreasonable ... seizures' of the person." Graham v. Connor , 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (alterations in original). Therefore, to bring a § 1983 excessive force claim under the Fourth Amendment, a plaintiff must first show that he was seized. See id. at 388, 109 S.Ct. 1865 ; Flores v. City of Palacios , 381 F.3d 391, 396 (5th Cir. 2004). Next he must show that he suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable. Flores , 381 F.3d at 396 (citing Goodson v. City of Corpus Christi , 202 F.3d 730, 740 (5th Cir. 2000) ). Plaintiff has satisfactorily alleged each element of a Fourth Amendment excessive force claim.
It is undisputed that Plaintiff was both seized and injured when Defendant pointed his firearm at Plaintiff and *674 subsequently shot him. An officer seizes a person when he, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Flores , 381 F.3d at 396 (citing Terry v. Ohio , 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ). When Defendant drew his gun and aimed it at Plaintiff, he clearly "restrained the liberty of a citizen" through physical force and show of authority. See Bazan , 246 F.3d at 490 ("[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." (quoting Tennessee v. Garner , 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ) ). It is similarly undisputed that Plaintiff suffered an injury when Defendant shot him in the face, satisfying the first element for an excessive force claim. "The second and third elements collapse into a single objective-reasonableness inquiry." Pena v. City of Rio Grande City , 879 F.3d 613, 619 (5th Cir. 2018) (citing Scott v. Harris , 550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ). This inquiry is guided by the following factors, laid out in Graham v. Connor , 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) : "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396, 109 S.Ct. 1865 ; see also Pena , 879 F.3d at 619 (applying Graham factors).
Every one of the factors listed in Graham supports a finding that Defendant's use of force was unreasonable. Here, where Plaintiff was never accused or suspected of any crime, neither the "severity of the crime at issue" nor the need to effectuate an arrest can justify Defendant's use of force. Nor does the Court find it plausible that Plaintiff posed an immediate threat to the safety of Defendant or anyone else. Plaintiff was armed only with a box cutter, and was alone on his own property with Defendant, who was separated from Plaintiff by a van and a dumpster and was free to exit the backyard the same way he entered. Given these facts, the "totality of the circumstances" did not justify the use of deadly force. See Garner , 471 U.S. at 8-9, 105 S.Ct. 1694. Therefore, Plaintiff has pleaded sufficient facts to state a constitutional claim.
2. Defendant's use of force against Plaintiff was objectively unreasonable under clearly established law existing at the time of the incident
Plaintiff argues that the "use of deadly force against non-threatening victims who are fleeing an officer" is objectively unreasonable under clearly established law. Resp. 5. Defendant responds that, under the precedent established by the Supreme Court in Kisela v. Hughes , --- U.S. ----, 138 S.Ct. 1148, 200 L.Ed.2d 449 (2018), his use of deadly force was reasonable. Mot. ¶ 18.
It is clearly established that the use of "deadly force violates the Fourth Amendment unless 'the officer has probable cause to believe the suspect poses a threat of serious physical harm either to the officer or to others.' " Bazan , 246 F.3d at 488 (quoting Garner , 471 U.S. at 11, 105 S.Ct. 1694 ). This threat must be "immediate." Garner , 471 U.S. at 11, 105 S.Ct. 1694. Defendant is correct that the "[u]se of excessive force is an area of law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." Kisela , 138 S.Ct. at 1153 (quoting Mullenix v. Luna , --- U.S. ----, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) ). However, he is wrong that Kisela is the precedent that "squarely governs" the specific facts at issue here. Unlike *675 Kisela , none of the facts alleged here suggest that Plaintiff posed a threat to anyone but himself.
In two unpublished opinions involving circumstances similar to the facts presented in this case, the Fifth Circuit found that officers who shot armed but non-threatening victims were not entitled to qualified immunity. See Reyes v. Bridgwater , 362 F. App'x 403 (5th Cir. 2010) ; Bacque v. Leger , 207 F. App'x. 374 (5th Cir. 2006). In Reyes , the evidence required the court to assume that the plaintiff "stood, in his own home, with a kitchen knife at this side, swaying slightly side to side, at a safe distance away from the officers when [the defendant] opened fire." 362 F. App'x at 407. The court also noted that the defendant officer "was responding to a 911 call reporting a domestic disturbance with possible violence" when he arrived on the scene; "he was not, that is, anticipating making a felony arrest, or even necessarily any arrest at all." Id. (internal quotation marks omitted). Given these facts, the court found that "there was no 'immediate threat' " as required to justify the use of deadly force. Id. (quoting Garner , 471 U.S. at 11, 105 S.Ct. 1694 ). Similarly, the panel in Bacque found that evidence that the defendant officer shot a suspect who "stood motionless with his knife at his side ... at least ten to forty feet away" and "was not threatening anyone at [the] time" prevented them from concluding that the defendant was entitled to qualified immunity. 207 F. App'x at 376. Both of these cases demonstrate the clearly established principle that, "even when a weapon is present, the threat must be sufficiently imminent at the moment of the shooting to justify deadly force." Luna v. Mullenix , 773 F.3d 712, 723 (5th Cir. 2014), rev'd on other grounds , --- U.S. ----, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015).
Here, where there was no imminent threat, the brutal use of deadly force described in the Complaint was objectively unreasonable under clearly established law existing at the time of the incident. Drawing all reasonable inferences in Plaintiff's favor, it is evident that there was no immediate threat of physical harm because Plaintiff did not make any threatening statements or movements against Defendant or anyone else; in fact, he was fleeing at the time that he was shot.
Defendant's reliance on Kisela is therefore misplaced. In Defendant's own description of that case, "Officer Kisela shot the [p]laintiff after being called on scene responding to a 911 call about a woman acting erratic and hacking a tree with a kitchen knife.... The [p]laintiff refused to drop her weapon and Officer Kisela shot her four times, believing she was a threat to her roommate who was standing nearby." Id. In finding that Kisela's conduct was not objectively unreasonable under clearly established law, the Court relied heavily on Kisela's statement that "he shot [the plaintiff] because, although the officers themselves were in no apparent danger, he believed she was a threat to [her roommate]." Kisela , 138 S.Ct. at 1153.
In contrast, Plaintiff alleges that he made no threatening statements or movements towards anyone but himself.[1]
*676 Compl. ¶ 17. In fact, the only person to whom he could conceivably have posed a threat is Defendant, who was eighteen feet away from Plaintiff when he began shooting.[2] At that distance, and with a van and a dumpster separating Plaintiff from Defendant, the Court finds it highly implausible that Plaintiff's box cutter posed any threat to Defendant. Furthermore, Plaintiff alleges that he was running away from Defendant when he stumbled, fell, and was shot in the face at close range. This contrasts sharply with the facts of Kisela , where the plaintiff "had taken steps toward another woman standing nearby" before being shot. Kisela , 138 S.Ct. at 1150 (emphasis added). Similarly, decisions in the Fifth Circuit finding that use of deadly force against an individual armed with a knife was reasonable have also hinged on the individual's threatening action immediately preceding the officer's use of force. See, e.g., Harris v. Serpas , 745 F.3d 767, 770, 772-73 (5th Cir. 2014) (holding that police officers had not violated Harris's right to be free from the use of excessive force when, after responding to a 911 call saying that Harris was suicidal, officers shot Harris when he stood up out of bed with a knife raised over his shoulder in a stabbing position and refused to drop the knife); Elizondo v. Green , 671 F.3d 506, 510 (5th Cir. 2012) (police officer had not used excessive force when Elizondo "was hostile, armed with a knife, in close proximity to [the officer], and moving closer" at the time officer fired on him).
Defendant's misguided reliance on Kisela appears to be based on a fundamental misunderstanding of the facts as alleged in this case. In his Motion, Defendant asserts that "Plaintiff alleged as follows in his Original Complaint : .... After repeated orders to the Plaintiff to drop the weapon, which were ignored, [Defendant] fired his service weapon at the Plaintiff. Plaintiff then ran closer to [Defendant], still holding the weapon, and [Defendant] fired one final shot, striking the Plaintiff." Mot. ¶¶ 2, 6 (internal citations omitted). This is not what Plaintiff alleges in the Complaint. On the contrary, Plaintiff alleges that he "ran away from Defendant Officer to [take] cover behind his van" after Defendant began shooting at him unprovoked. Compl. ¶ 23; see also Resp. 5 (emphasizing that Plaintiff was shot "while running away" and "posed no threat to ... any cognizable person").
In his Reply, Defendant ignores this explicit allegation that Defendant was fleeing at the time that he was shot. Instead, Defendant makes much of the fact that, according to the Complaint, "[t]he distance between [Plaintiff and Defendant] at the time the first shots were fired was approximately eighteen feet," Compl. ¶ 22, while Plaintiff's body was "approximately 10.5 away from the dumpster" after the shooting, id. ¶ 24. Specifically, Plaintiff alleges that he was found "on the opposite end of *677 the van from where the shooting began, and the side of the van away from where [Defendant] initially stood," showing that Plaintiff was running away from Defendant when he was shot. Id. Defendant responds that "it makes no sense whatsoever that someone could be found closer to another person than originally positioned, in this case 10.5 feet rather that [sic] 18 feet, and clearly be fleeing." Reply ¶ 5.
This argument is flawed for a number of reasons. First, it misreads Plaintiff's allegations: Plaintiff alleges that he was eighteen feet from Defendant when the shooting began, and ten and a half feet from the dumpster when it ended. Given that Defendant had allegedly taken cover by placing the dumpster between himself and Plaintiff, it is possible that Plaintiff would be closer to the dumpster than to Defendant's starting position after the shooting. Second, it disregards the path of movement described in Plaintiff's Complaint. Plaintiff alleges that he ran to the end of the van away from where Defendant initially stood. Depending on the configuration of the van and the dumpster, it again is plausible that Plaintiff could end up slightly closer to nearest part of the dumpster while fleeing from Defendant. Third, and most importantly, Defendant's argument seeks to evade the requirement that the court must accept well-pleaded facts as true and view them in a light most favorable to the plaintiff. Calhoun , 312 F.3d at 733. Plaintiff has repeatedly and consistently alleged that he was running away from Defendant when he was shot. None of the facts in the Complaint, viewed in the light most favorable to Plaintiff, are inconsistent with that claim. As a result, Defendant's pronouncement that Plaintiff's allegation that he was fleeing when he was shot "makes no sense whatsoever" is misguided. See Bennett, et al. v. State Farm Mut. Ins. , 731 F.3d 584 (6th Cir. 2013) (Kethledge, J.) (good reasons not to deride an opponent's arguments include "civility," "the near-certainty that overstatement will only push the reader away," and that "the argument that [a party] derides as ridiculous is instead correct").
Because Plaintiff did not pose an immediate threat to Defendant or others, such as would justify Defendant's use of deadly force, the relevant authority in this case is Reyes and Bacque , not Kisela . Compare Reyes , 362 F. App'x at 407 (no qualified immunity where plaintiff was holding a knife but was "a safe distance away" when defendant officer shot him); Bacque , 207 F. App'x at 376 (no qualified immunity because plaintiff "was not threatening anyone at [the] time") with Kisela , 138 S.Ct. at 1153 (qualified immunity for defendant officer who reasonably "believed [Plaintiff] was a threat"). Accordingly, Defendant's motion is denied as to Plaintiff's excessive force claim. See Schaefer v. Whitted , 121 F.Supp.3d 701, 716 (W.D. Tex. 2015) (declining to find qualified immunity for defendant officer who shot a suspect who was lawfully armed on his own property and did not point weapon at the officer).
C. Unlawful Entry
Plaintiff also alleges that Defendant "deprived [Plaintiff] of his rights under the Fourth and Fourteenth Amendments of the United States Constitution by intentionally entering [Plaintiff]'s property without a warrant or probable cause, and under no exigent circumstances." Compl. ¶ 117. In response, Defendant argues that his actions were reasonable under the emergency aid and community caretaking exceptions to the Fourth Amendment. Mot. ¶¶ 21-22. Plaintiff counters that these exceptions do not apply to the facts of this case, and that they further do not exempt police from the "knock and announce" requirement. Resp. 9. The Court addresses each of these arguments in turn.
*678 1. Defendant's warrantless entry onto the property was not clearly unreasonable under existing law.
It is well established that entry into a home, or the "curtilage" of a home, by law enforcement without a warrant is "per se" unreasonable under the Fourth Amendment, unless one of "a few specifically established and well-delineated exceptions" applies. City of Ontario, Cal. v. Quon , 560 U.S. 746, 760, 130 S.Ct. 2619, 177 L.Ed.2d 216 (2010) (citing Katz v. United States , 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ). And it is undisputed that Defendant conducted a warrantless search of Plaintiff's home when he passed through the gate into the backyard, entering the curtilage of the home. See United States v. Trejo , 378 F. App'x 441, 448 (5th Cir. 2010) (entry into backyard was breach of curtilage); Fixel v. Wainwright , 492 F.2d 480, 483 (5th Cir. 1974) (officer "unlawfully encroached on a protected area when he actually entered the backyard"). Accordingly, Plaintiff has stated a constitutional claim on the basis of unlawful entry.
Nevertheless, the question remains whether Defendant's actions were objectively unreasonable under established law. Defendant argues that his entry into Plaintiff's backyard without a warrant or consent was justified under two exceptions to the Fourth Amendment's warrant requirement: the community caretaking exception and the emergency aid exception. Mot. ¶¶ 21-22. Plaintiff responds that the Fifth Circuit has not expanded the community caretaking exception to apply to contexts beyond searches and seizures of automobiles. Plaintiff further argues that, at the time of his entry onto Plaintiff's property, Defendant lacked knowledge that the situation was sufficiently urgent to justify entry under either exception.
a. Community Caretaking
The community caretaking doctrine was first announced by the Supreme Court in Cady v. Dombrowski , 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In that case, the Court found that police officers are justified in performing certain types of automobile searches while performing "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. at 441, 93 S.Ct. 2523. The Court in Cady emphasized "[t]he constitutional difference between searches of and seizures from houses and similar structures and from vehicles" in the context of the Fourth Amendment's protections. Id. Moreover, it stressed "[t]he Court's previous recognition of the distinction between motor vehicles and dwelling places" in concluding that the search of a vehicle for "caretaking" purposes was not unreasonable. Id. at 447, 93 S.Ct. 2523. Since Cady , some circuits have expanded this "community caretaking" exception to searches of residences as well as automobiles, while others have explicitly declined to do so. Compare, e.g., United States v. Quezada , 448 F.3d 1005, 1007 (8th Cir. 2006) ("A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention.") with Sutterfield v. City of Milwaukee , 751 F.3d 542, 555 (7th Cir. 2014) ("This court ... has limited the community caretaker doctrine to automobile searches.").
While the Fifth Circuit has not spoken directly on this issue, it has never applied Cady beyond the context of automobile searches.[3] Instead, it has consistently acknowledged *679 the constitutional distinction between searches of automobiles and residences. For example, in United States v. Holmes , 537 F.2d 227 (5th Cir. 1976), the Fifth Circuit noted that "[t]his Court has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment" and that "warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not." Id. at 236 (citing Cady , 413 U.S. at 439-40, 93 S.Ct. 2523 ). Similarly, the Fifth Circuit noted in United States v. Weinrich , 586 F.2d 481 (5th Cir. 1978) that "[t]he Supreme Court has several times reaffirmed the validity of warrantless automobile searches on the basis of an automobile's mobility and the special dangers it presents for the destruction of evidence." Id. at 492-93 (citing Cady , 413 U.S. at 433, 93 S.Ct. 2523 ). And in United States v. McLaughlin , 578 F.2d 1180, 1183 (5th Cir. 1978), the Fifth Circuit observed that the Supreme Court has "sanctioned warrantless auto searches in the absence of any exigencies created by the mobility or vulnerability of the searched vehicle," noting that the justification for those searches was "the diminished expectation of privacy which surrounds the automobile." Id. at 1183 (citing Cady , 413 U.S. at 441-42, 93 S.Ct. 2523 ). More recent Fifth Circuit decisions have continued to consider the community caretaking exception exclusively in the context of automobile searches and seizures. See, e.g., United States v. McKinnon , 681 F.3d 203, 208 (5th Cir. 2012) (discussing the "reasonableness of ... vehicle impoundment for a community caretaking purpose").
Consistent with this Fifth Circuit precedent, Texas trial courts at both the state and federal level have recognized that the community caretaking exception "deals primarily with searches and seizures of automobiles (and will be limited to those circumstances except in unusual circumstances)." Laney v. State , 117 S.W.3d 854, 861 (Tex. Crim. App. 2003) (en banc); see also Sanchez v. Gomez , No. EP-17-CV-133-PRM, 2017 WL 3842137, at *6 (W.D. Tex. Sept. 1, 2017) ("[T]he exception applies almost exclusively to automobile searches."). This case clearly deals with the search of a residence, not an automobile. Defendant identifies no "unusual circumstances" to justify applying the community caretaking exception to such a search, nor does he cite any legal precedent from this circuit applying the exception outside of the context of an automobile search. The absence of any Fifth Circuit precedent for applying the community caretaking exception to a search of a residence establishes that the exception is not available to justify such a search.[4] Accordingly, *680 the Court finds that, under Fifth Circuit law, Defendant's warrantless entry into Plaintiff's backyard does not fall under the community caretaking exception.
b. Emergency Aid
Plaintiff additionally argues that his warrantless entry was not objectively unreasonable under the emergency aid exception to the Fourth Amendment's warrant requirement. This exception establishes that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Brigham City v. Stuart , 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). "This 'emergency aid exception' does not depend on the officers' subjective intent," but "requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid." Michigan v. Fisher , 558 U.S. 45, 47, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (internal quotation marks and alterations in original removed). The Fifth Circuit has specifically held that "the threat an individual poses to himself may create an exigency that makes the needs of law enforcement so compelling that a warrantless entry is objectively reasonable under the Fourth Amendment." Rice v. ReliaStar Life Ins. Co. , 770 F.3d 1122, 1131 (5th Cir. 2014).
Plaintiff argues that this exception does not apply for two reasons.[5] First, he argues that Defendant had not received any information from which he could conclude that Plaintiff was in need of emergency aid. However, the Fifth Circuit has found that a 911 call reporting that a person is suicidal can give rise to "an objectively reasonable belief that [the subject of the report] would imminently seriously injure himself." Rice , 770 F.3d at 1132. In Rice , the Fifth Circuit found qualified immunity for an officer who entered Rice's home without a warrant in response to a 911 call from Rice's nephew reporting that Rice was "sitting in [his] truck with a loaded gun to his head and threatening to commit suicide." Id. at 1127. The panel in that case found that the officers' knowledge that "Rice was suicidal; Rice had a gun; and Rice had been drinking and was sitting in his truck holding a gun to his head" made it "objectively reasonable for [the officer] to believe he needed to protect Rice from imminent injury." Id. at 1132.
Plaintiff attempts to distinguish the facts of the instant case from those in Rice , arguing that the 911 call from Plaintiff's *681 estranged wife did not include any information that Plaintiff was intoxicated or possessed a weapon. Resp. 12. Plaintiff argues that the facts of this case instead align more closely with those of United States v. Timmann , 741 F.3d 1170 (11th Cir. 2013), in which the Eleventh Circuit found that officers' warrantless entry was not justified because officers "observed no violent behavior, [and] 'did not see or hear evidence that a fight had taken place or that anyone had been injured." Resp. 12 (quoting Timmann , 741 F.3d at 1181 ). However, the court in Rice specifically distinguished Timmann on the basis that the officer in that case "did not 'have any information that would lead them to suspect that Timmann might be suicidal.' " Rice , 770 F.3d at 1132 (quoting Timmann , 741 F.3d at 1180-81 ).
Here, where Defendant had received information that Plaintiff was suicidal, it was not clearly established that it was unreasonable for him to enter the backyard without a warrant to provide assistance to Plaintiff. "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." Fisher , 558 U.S. at 49, 130 S.Ct. 546 (internal quotation marks omitted); see also Georgia v. Randolph , 547 U.S. 103, 118, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) ("[I]t would be silly to suggest that the police would commit a tort by entering ... to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur."). This may be particularly true in cases where police receive reports that an individual is suicidal. Because "[t]he act of suicide requires no help from another individual and can be accomplished very quickly," "[t]o require that an officer who has received information from a credible source, or sources, that an individual is a suicidal risk, wait to obtain a warrant before saving that victim, would likely result in countless preventable deaths." Ziegler v. Aukerman , 512 F.3d 777, 786 (6th Cir. 2008).
Indeed, the Fifth Circuit has repeatedly applied the emergency aid exception where officers entered a home without a warrant based on a report that someone inside was suicidal.[6] See Rice , 770 F.3d at 1132 ; Velasquez v. Audirsch , 574 F. App'x 476, 482 (5th Cir. 2014) (officers could have "reasonably believed that [occupant] was suicidal" based on the fact that he had threatened another person before retreating into his home with the knife, and his mother told the officers that he was "deranged" and off his medication); Rockwell v. Brown , 664 F.3d 985, 989 (5th Cir. 2011) (warrantless entry into room did not violate clearly established law because occupant's mother told police that he "had schizophrenia, was talking to himself, hadn't taken his medication for several days, refused to come out of his room, and that she believed that [he] was taking illegal drugs," and stated that she "did not know" what he would do if police left without detaining him).
To be clear, the facts as alleged make no suggestion that Plaintiff was deranged, *682 violent, or otherwise a threat to anyone but himself. However, given existing precedent within the Fifth Circuit, it is not clearly established that the emergency aid exception to the Fourth Amendment's warrant requirement does not extend to situations in which police receive a report of a potentially suicidal individual without such additional facts. While the facts known to Defendant were considerably less extreme than those in Rice, Velasquez , and Rockwell -where officers were responding to reports of suicidal occupants coupled with more specific information indicating that those occupants posed a threat to others or themselves-it is far from clear that the Fifth Circuit would have resolved those cases differently had those more specific facts been lacking. Precedent from this and other circuits indicates instead that police officers may enter a residence without a warrant to provide aid to someone inside based on credible reports that the person is suicidal. See Rice , 770 F.3d at 1132 ; Roberts , 643 F.3d at 906. Defendant's entry into Plaintiff's backyard was therefore not clearly unreasonable under established law. See Rice , 770 F.3d at 1132
Plaintiff additionally argues that, even if Defendant had reason to believe that an emergency existed at the time he received notice of the 911 call from Plaintiff's estranged wife, he had no reason to believe that such an emergency persisted two hours later when he responded to the call. The Fifth Circuit has previously held that police delay in responding to a report of an emergency does not necessarily render the emergency aid exception inapplicable. United States v. Toussaint , 838 F.3d 503, 510 (5th Cir. 2016) (finding that police had an "objectively reasonable basis for thinking an emergency persisted" forty-five minutes after receiving a credible threat against a specific individual); accord Sutterfield , 751 F.3d at 553 (nine hour delay between psychiatrist's phone call to police reporting that her patient was suicidal and warrantless entry into patient's home did not negate emergency aid exception). The two hour delay in this case similarly does not negate Defendant's objectively reasonable basis for thinking an emergency persisted. Given the facts known to Defendant at the time of his warrantless entry, he could have reasonably believed that Plaintiff remained suicidal and might imminently harm himself, or that Plaintiff had already harmed himself and required assistance. Defendant's entry into Plaintiff's backyard was therefore not clearly unreasonable under established law, despite the passage of time.
2. Defendant's entry onto Plaintiff's property without knocking and announcing himself violated the Fourth Amendment and was clearly unreasonable under established law.
Plaintiff additionally argues that, even if Defendant was not objectively unreasonable in entering the backyard without a warrant, his failure to knock and announce himself before doing so violated the Fourth Amendment. Resp. 9. The Supreme Court has noted that "[t]he common-law principle that law enforcement officers must announce their presence and provide residents an opportunity to open the door is an ancient one." Hudson v. Michigan , 547 U.S. 586, 589, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (citing Wilson v. Arkansas , 514 U.S. 927, 931-932, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995) ). In 1995, the Supreme Court held explicitly that this ancient principle is "is an element of the reasonableness inquiry under the Fourth Amendment." Wilson , 514 U.S. at 934, 115 S.Ct. 1914. Accordingly, Plaintiff's argument that Defendant's entry was unlawful because he failed to knock and announce himself successfully states a constitutional claim. The only question that *683 remains for the Court on this issue is whether Defendant's actions were objectively unreasonable under clearly established law.
Defendant makes no argument in defense of his decision to enter Plaintiff's home without knocking, announcing himself, and allowing Plaintiff or another occupant of the home to come speak with him at the entrance before entering the property. Furthermore, none of his arguments justifying his warrantless entry of the backyard serve to excuse his entry without knocking and announcing his presence. As the Fifth Circuit has held, exigent circumstances "may give the officer the authority to be inside a home without a warrant, but [they do] not have any bearing on the constitutionality of the manner in which he enters the home. The entry itself is the point of the knock-and-announce rule." Trent v. Wade , 776 F.3d 368, 382 (5th Cir. 2015).
While there are exceptions to the knock-and-announce rule, Defendant has not argued that any of them apply in this case. The Supreme Court has held that, in order to justify a "no-knock" entry, "the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards v. Wisconsin , 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997). The Fifth Circuit has explicitly ruled that, even when warrantless entry is justified by exigent circumstances, at least one of these factors must be present to excuse a no-knock entry. Trent , 776 F.3d at 382 (holding that "hot pursuit-unless accompanied by one of the specific justifications enumerated in Richards -does not justify a no-knock entry").
Here, Defendant has made no argument that any of the Richards justifications apply. Both the Supreme Court and the Fifth Circuit require police officers to articulate the justification for their decision not to comply with the knock-and-announce requirement. In Richards , the Court stated that the "showing [required to justify a no-knock entry] is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." 520 U.S. at 394-95, 117 S.Ct. 1416. The Fifth Circuit similarly "require[s] officers to 'at least articulate' the reasonable suspicion justifying the no-knock entry." Trent , 776 F.3d at 378 (quoting United States v. Cantu , 230 F.3d 148, 152 (5th Cir. 2000) ). Here, where Defendant has made no attempt at all to articulate the reasonable suspicion justifying his no-knock entry, the Court cannot find that his failure to knock and announce himself was reasonable.
The Court recognizes that, because the backyard had only a gate rather than a door, the application of the knock-and-announce requirement to this case is not as straightforward as it might be. However, the justification for the rule applies just as strongly in this case as it would had Defendant found Plaintiff sitting in his living room instead of the backyard. The Fifth Circuit has noted that "the [knock-and-announce] rule serves several fundamental interests including '(1) protecting law enforcement officers and household occupants from potential violence; (2) preventing the unnecessary destruction of private property; and (3) protecting people from unnecessary intrusion into their private activities.' " Cantu , 230 F.3d at 151 (5th Cir. 2000) (quoting United States v. Sagaribay , 982 F.2d 906, 909 (5th Cir. 1993) ). Here, the facts show that, based only on a report that there was a potentially suicidal individual in the backyard, Defendant intruded *684 on Plaintiff in the privacy of his own home and immediately escalated the situation into a violent confrontation that culminated in Defendant's shooting of Plaintiff at close range. The knock-and-announce rule is intended specifically to avoid such an occurrence.
Furthermore, the Supreme Court has recognized that it may sometimes be difficult to apply the knock-and-announce rule to the facts of a particular case. See Hudson , 547 U.S. at 590, 126 S.Ct. 2159 ("When the knock-and-announce rule does apply, it is not easy to determine precisely what officers must do."). The solution to this, however, is not to excuse officers from following the rule, but rather to allow flexibility in how they observe it, as the Supreme Court did in Brigham City , 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650. In that case, when knocking on the door at a loud house party would have been futile, the Court held that the manner of the officer's entry was reasonable where he loudly announced himself both from outside and just inside the screen door at the entrance to the house. Id. at 406-07, 126 S.Ct. 1943.
Under the well-pleaded facts of this case, Defendant would have had multiple options for complying with the knock-and-announce requirement. He could have knocked and announced himself at the front door of the house and waited a reasonable amount of time for an occupant to come to the door. Alternatively, he could have rapped on the gate to the backyard, loudly announced himself, and awaited a response there. His decision instead to enter the backyard without making any attempt to satisfy the knock-and-announce requirement violated the Fourth Amendment and was objectively unreasonable under established law. See Bellotte v. Edwards , 629 F.3d 415 (4th Cir. 2011) ("A professed concern for the suspect, grounded in little more than speculation [that he might be a suicide risk], fails to justify the ironic result of a violation of that very suspect's rights [due to officers' failure to knock and announce]."). Accordingly, Defendant's motion is denied as to Plaintiff's unlawful entry claim.
III. CONCLUSION
For the foregoing reasons, Defendant's Motion to Dismiss, ECF No. 15, is DENIED . Plaintiff may proceed with his claim for excessive force, as well as his claim for unlawful entry on the basis of Defendant's failure to knock and announce.
SO ORDERED.

In his Reply, Defendant insists, without citing any legal authority, that "[h]olding a knife to anyone's throat, including your own, would seem to be threatening behavior." Reply ¶ 4. To the extent that Defendant intends to argue that an officer may use deadly force to prevent an individual from threatening or harming himself, this proposition does not comport with Fifth Circuit precedent. See Bazan , 246 F.3d at 488 (use of deadly force violates the Fourth Amendment unless the officer has probable cause to believe the suspect poses a threat of serious physical harm either to the officer or to others). Defendant cites no law to support his suggestion that the use of deadly force is reasonable against an individual who poses a threat only to himself rather than to the officer or others, and the Court finds no reason to so hold.

Defendant suggests for the first time in his Reply that Plaintiff could also have posed a threat to his brother, Mr. Romero, who entered the backyard in an attempt to de-escalate the situation. Reply ¶ 8. However, Defendant is incorrect that Plaintiff's Complaint "did not mention ... how close he was" to Mr. Romero. Id. To the contrary, Plaintiff alleges that Defendant "would not allow [Mr. Romero] to get near his brother, or to speak with him." Compl. ¶ 20. Plaintiff further alleges that Defendant "pointed his gun at" Mr. Romero as he was attempting to explain Plaintiff's mental health condition. Id. These facts do not suggest that Plaintiff posed any threat to Mr. Romero, or that Defendant was acting to avert such a threat when he shot Plaintiff.

In United States v. York , 895 F.2d 1026 (5th Cir. 1990), the Fifth Circuit did cite Cady to support its holding that the limited entry of police into a home to perform a peacekeeping function at the request of a guest did not violate the Fourth Amendment. See ids="10537532" index="180" url="https://cite.case.law/f2d/895/1026/">id. at 1030. In doing so, however, the panel noted that Cady stands for the proposition that "[m]any police activities involving the custody of motor vehicles are within the caretaking function of the police, and this may work to make a vehicle inspection or search reasonable." Id. (emphasis added). The Court therefore reads York as maintaining Cady ' s distinction between searches of automobiles and residences, rather than extending Cady to apply to residences as well. But cf. Sutterfield , 751 F.3d at 556 (describing the decision in York as "framed as an exigent circumstances decision, but stressing community caretaking role of police in abating noise disturbance").

This Court notes that the court in Harvey v. Montgomery County, Tex. , 881 F.Supp.2d 785, 803 (S.D. Tex. 2012), appears to have granted qualified immunity on the basis of disagreement between the circuits on this question. However, an examination of the court's reasoning in that case reveals that the court essentially treated the community caretaking exception as a "modified exigent circumstances test, with perhaps a lower threshold for exigency if the officer is acting in a community caretaking role." Id. (quoting Ray v. Twp. of Warren , 626 F.3d 170, 177 (3rd Cir. 2010) ). Indeed, the court in Harvey based its grant of qualified immunity on its finding that "an officer could have operated under a reasonable belief that there was an emergency on [the p]laintiff's property,"id. , without engaging in the four-part analysis associated with the community caretaking exception, see Corbin v. State , 85 S.W.3d 272, 277 (Tex. Crim. App. 2002). Harvey therefore appears to conflate the emergency aid exception with the community caretaking exception, and does not provide legal authority for applying the community caretaking exception separately from an emergency aid analysis, as Defendant urges this Court to do. See Mot. ¶ 22; cf. United States v. Toussaint , 838 F.3d 503, 507 (5th Cir. 2016) (conflating the emergency aid exception with the " 'community caretaking function' [that police officers serve] to ensure the safety of citizens").

Defendant asserts in his Reply that "Plaintiff completely failed to address [Defendant]'s reliance on the Emergency Aid exception" in his Response. Reply ¶ 10. This is incorrect. Plaintiff very clearly addresses both the community caretaking and emergency aid exceptions in his Response. See, e.g. , Resp. 9 ("As to rendering of emergency aid, no information was conveyed to [Defendant] which [he] could have reasonably relied upon in concluding [Plaintiff] was in need of emergency aid.").

Other circuits have done the same. See Fitzgerald v. Santoro , 707 F.3d 725, 732 (7th Cir. 2013) (holding that police officers had "an objectively reasonable belief that they needed to enter without a warrant in order to prevent serious injury" where they had "been told that the woman inside [the home] had called a police station, that she sounded intoxicated, and that she had threatened suicide"); Roberts v. Spielman , 643 F.3d 899, 906 (11th Cir. 2011) (per curiam) (holding that the police officer's warrantless entry did not violate the Fourth Amendment where he was responding to a reliable report that Roberts was suicidal); Ziegler , 512 F.3d at 786 (concluding that exigent circumstances justified warrantless entry where a police officer was acting to help a suicidal woman).