# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 22, 2010

No. 09-10076

Charles R. Fulbruge III
Clerk

LUZ M REYES, Individually and as the Representative of the Estate of JOSE PACHECO CEBALLOS, Deceased, and as the Representative of the Estate of Carmen Ceballos, Deceased, and as Guardian of A R, Minor Child,

Plaintiffs - Appellants

v.

WILLIAM BRIDGWATER; JOSE PORRAS; WILLIAM MULL, Chief of Police,

Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:08-CV-56

Before KING, GARZA, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:[*]

Jose Ceballos, Jr., was shot and killed by Officer William Bridgwater of the City of Plainview's police department during an incident at Ceballos's home. His family (the "Ceballos Family")[1] sued Bridgwater; his supervisor, Jose Porras; the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] We GRANT the plaintiffs-appellants' unopposed motion to substitute parties in this matter pursuant to Federal Rule of Appellate Procedure 43.

No. 09-10076

Chief of Police; and the City of Plainview[2] under 42 U.S.C. § 1983 and certain state law theories. The district court granted summary judgment to the individual defendants, and the Ceballos Family appeals. For the reasons set forth below, we REVERSE the summary judgment as to Bridgwater on the § 1983 claim and REMAND that portion and otherwise AFFIRM the district court's judgment.

## I. Facts

On September 11, 2006, Luz Maria Reyes telephoned 911 and reported that her brothers, Andres Pacheco and Ceballos, were fighting at the apartment in Plainview, Texas, where their mother, Carmen Ceballos ("Mrs. Ceballos"), lived, and then hung up on the operator. Responding to that call, Bridgwater arrived at the apartment and found Reyes and Pacheco outside the door to the apartment and the door closed. Reyes and Pacheco told Bridgwater that there was not a fight in the apartment and that Ceballos and their mother were inside.

Bridgwater then knocked on the door, announced the presence of police, and asked that the door be opened. The door remained closed. Bridgwater then requested the assistance of Porras. Ceballos looked through a window adjacent to the door, and Bridgwater signaled for him to open the door. Ceballos retreated into the apartment and did not open the door. Someone screamed from inside the apartment,[3] and Bridgwater then instructed Pacheco and Reyes to step back from the door and kicked the door open. Porras arrived moments afterward, and both officers drew their weapons as they looked into the entryway.

---

[2] The appeal involving the disposition of the case against City of Plainview has proceeded separately under Case No. 09-10412 and is not before us here.

[3] The Ceballos Family disputes this fact, but points to no contrary evidence in the record.

No. 09-10076

Ceballos moved into the entryway holding a kitchen knife in one hand and a cigarette in the other. Mrs. Ceballos was also inside the apartment. Bridgwater ordered Ceballos to get down and to put down the knife in English; Porras repeated the command in Spanish. Both officers repeated the instruction, in both languages, multiple times. Ceballos did not comply and told the officers to leave.

It is undisputed that Ceballos next threw down his cigarette, that Bridgwater twice said, "Don't do it," and that Bridgwater fired one shot at Ceballos, which struck him in the chest and ultimately killed him. As to the further details of the event, the testimony of Reyes and Mrs. Ceballos conflicts with that given by the police officers. The import of those conflicts is the central issue presented by this appeal.

Bridgwater testified that, just before the shooting, Ceballos suddenly appeared more aggressive, threw his cigarette butt at the officers, stepped forward toward the officers, and raised the knife he was holding. Reyes and Mrs. Ceballos, on the other hand, testified that Ceballos flicked his cigarette butt nonaggressively, did not step forward towards the officers (instead, that he was swaying side to side), and did not raise the knife. Bridgwater testified that, but for Ceballos's action of stepping forward and raising the knife—actions Ceballos's family members say did not occur—he would not have shot Ceballos.

The Ceballos Family sued for violation of Ceballos' constitutional rights under 42 U.S.C. § 1983 and asserted a number of additional state tort claims—gross negligence, assault, wrongful death, intentional infliction of emotional distress, failure to adequately supervise, failure to discipline, and failure to train. The individual defendants asserted, among other defenses, a defense of qualified immunity as to the federal claims and moved for summary judgment on that basis. The individual defendants also asserted a statutory basis for dismissal for failure to state a claim as to the state law causes of action.

No. 09-10076

The district court granted the individual defendants' motions for summary judgment and dismissal and entered a Rule 54(b) final judgment as to the individual defendants only.  This appeal followed.

## II.  Standard of Review

We review a grant of summary judgment de novo.  *N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.*, 541 F.3d 552, 555 (5th Cir. 2008).  Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); that is, "[a]n issue is material if its resolution could affect the outcome of the action."  *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002).  When reviewing a grant of summary judgment, we view all facts and evidence in the light most favorable to the non-moving party.  *United Fire & Cas. Co. v. Hixson Bros.*, 453 F.3d 283, 285 (5th Cir. 2006).  In doing so, we "refrain from making credibility determinations or weighing the evidence."  *Nationwide Mut. Ins. Co. v. Lake Caroline, Inc.*, 515 F.3d 414, 418 (5th Cir. 2008).

The doctrine of qualified immunity provides immunity from suit under § 1983 to government officials provided that "their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known."  *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Wallace v. County of Comal*, 400 F.3d 284, 289 (5th Cir. 2005)); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("The entitlement [to qualified immunity] is an *immunity from suit* rather than a mere defense to liability . . . .").  At the summary judgment stage, therefore, "[w]hen a defendant pleads qualified immunity as an affirmative defense . . . , a court must decide (1)

4

No. 09-10076

whether the facts alleged or shown by the plaintiff ma[k]e out a violation of a constitutional right, and (2) whether that right was 'clearly established' at the time of the defendant's alleged misconduct." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009). The absence of a genuine issue of material fact on *either* element means that the defendant is entitled to summary judgment.[4] "To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present 'absolute proof,' but must offer more than 'mere allegations.'" *Id.* (quoting *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991)).

As noted above, several facts are disputed. The first question, therefore, is whether any of those facts are material, that is, whether they change the outcome of the qualified immunity analysis. As this court in *Goodson v. City of Corpus Christi* framed the inquiry, "summary judgment is inappropriate unless plaintiff's version of the violations does not implicate clearly established law." 202 F.3d 730, 739 (5th Cir. 2000).

## III.  Discussion

### *A.  Bridgwater*

If Bridgwater is entitled to qualified immunity even under Reyes's version of events, then summary judgment was appropriate because the dispute of facts would be immaterial; otherwise, summary judgment was improperly granted. *See, e.g.*, *Goodson*, 202 F.3d at 739. Thus, this issue turns on whether there is a *material* issue of fact.

Bridgwater is entitled to qualified immunity at this procedural stage if, under Reyes's version of events, his use of deadly force was not "clearly excessive

---

[4] After the district court's decision, the Supreme Court reconsidered and made non-mandatory its previous requirement that courts always evaluate whether the conduct as shown at summary judgment in fact violated a constitutional right before evaluating whether the right at issue was clearly established. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) (limiting *Saucier v. Katz*, 533 U.S. 194 (2001)). As *Ontiveros* notes, however, *Pearson* regarded the *Saucier* methodology as "often beneficial," and there is no error in the district court's pre-*Pearson* approach. *See* 564 F.3d at 382; *see also Pearson*, 129 S. Ct. at 818.

5

or clearly unreasonable." *See Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008) (internal punctuation omitted). Unlike some areas of constitutional law, the question of when deadly force is appropriate – and the concomitant conclusion that deadly force is or is not excessive – is well-established. *Tennessee v. Garner*, 471 U.S. 1, 11–12, 21 (1985) (holding that deadly force is not justified unless a suspect poses a risk of serious harm at that point in time). We recently explained that the focus of the inquiry is "the act that led [the officer] to discharge his weapon." *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009). Here, the summary judgment standard requires that the court conclude that there was, in essence, no such act, i.e., that the raised knife and threatening step forward did not occur.

Bridgwater argues that *Ramirez* supports his defense of qualified immunity. *Ramirez*, however, is distinguishable in critical respects. In *Ramirez*, police stopped a car driven by a suspect whom they knew to be armed. The suspect refused to comply with the officers' instructions and displayed a gun, but never raised it or aimed it at the officers. Ten seconds after the suspect exited the car, one officer fired at and seriously injured the man. 542 F.3d at 127. The Fifth Circuit reversed a magistrate judge's conclusion that the officers were not entitled to qualified immunity, pointing out that the suspect "repeatedly refused the officers' commands and ultimately stood, armed, several yards from the officers. [He] brought his hands together in what we believe could reasonably be interpreted as a threatening gesture." *Id.* at 131.

There are two major distinctions between *Ramirez* and the present case. First, under the facts presented by the Ceballos Family, Ceballos did not make "a threatening gesture" (or motion) as did the suspect in *Ramirez*. Second, Ceballos was armed with a knife, not a gun. The latter distinction limits the usefulness of *Ramirez*'s exhortation that the court examine the situation from the perspective of "the reasonable beliefs of officers standing yards away from

a defiant, disturbed, and armed man." *See id.* at 130. The immediacy of the risk presented by a man armed with a kitchen knife at his side is far less than that of a man armed with a gun: a gun can kill instantaneously at the distance that the man shot by the officer in *Ramirez* stood, whereas Ceballos would have had to first either advance toward Bridgwater or at least raise the knife before he could inflict any harm. *See Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003) (finding no constitutional violation in the situation of "an intoxicated, violent and uncooperative individual who was wielding a sword within eight to ten feet of several officers in a relatively confined space"; in that situation, the decedent raised the sword and then was shot); *see also Chappell v. City of Cleveland*, 585 F.3d 901, 910 (6th Cir. 2009) (qualified immunity granted where teenager refused to drop knife and instead advanced on the officers, who were in close proximity, with the knife raised). *Ramirez* does not control this case.

The Supreme Court has required courts to be deferential to the choices made by police officers in high-risk situations. *See Graham v. Connor*, 490 U.S. 386, 397 (1989). That deference, however, cannot extend so far as to ignore an officer's violation of the core, established rule that deadly force may not be used "[w]here the suspect poses no immediate threat to the officer and no threat to others." *Garner*, 471 U.S. at 11. It violates the Fourth Amendment to use deadly force absent such a threat.

Here, there was no "immediate threat" as *Garner* requires. The evidence, viewed as required in this procedural posture, does not support the district court's conclusion that there was no constitutional violation. At the summary judgment stage, where the court must resolve conflicting evidence in favor of the plaintiff, the court must assume that Ceballos stood, in his own home, with a kitchen knife at this side, swaying slightly side to side, at a safe distance away from the officers when Bridgwater opened fire. When Bridgwater arrived on the scene, furthermore, he was responding to a 911 call reporting a "domestic

disturbance with possible violence"; he was not, that is, anticipating making a felony arrest, or even necessarily any arrest at all.[5]

The facts that distinguish the present case from *Mace* and *Ramirez* directly address the core issue: whether the officer reasonably perceived an immediate threat. In the language of *Manis*, there was no "act" to justify shooting. If Bridgwater's conduct was constitutionally permissible, then the Fourth Amendment allows an officer to use deadly force against a person not suspected of any serious crime who is in his own home—that the officers have entered by breaking down the door—standing at a safe distance holding a kitchen knife merely *because* he is holding the knife and does not put it down despite police instruction to do so. *Cf. Bacque v. Leger*, 207 F. App'x 374, 376 (5th Cir. 2006) (unpublished)[6] (finding evidence officers shot a suspect "while he stood motionless with his knife at his side . . . at least ten to forty feet away" sufficiently material to preclude any resolution as a matter of law). Such a threat is by definition not "immediate" because the individual must still *do* something—the *Manis* "act"—before the latent threat materializes into any risk of harm. In that interval, there would have been time for Bridgwater to respond. Under these facts and in this situation, Bridgwater's use of deadly force absent an *immediate* threat from Ceballos was a constitutional violation.

---

[5] While we have of course found the use of deadly force constitutional in circumstances that do not involve felony arrests, *see, e.g.*, *Manis*, 585 F.3d at 842, the "severity of the crime at issue" is among the factors that comprise the totality of the circumstances under *Graham*. 490 U.S. at 396; *cf. Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005) (noting that the "severity of the crime at issue was minimal" in an arrest over a custody dispute), *Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008) (holding that "the amount of force should [be] reduced accordingly" in proportion to the severity of the crime). The severity of the "crime" here was likely at most a misdemeanor, and it is not even clear that Ceballos was the suspect.

[6] Although unpublished opinions are not precedent, we cite this decision for its persuasive value under similar facts.

No. 09-10076

A summary judgment based upon qualified immunity would still be appropriate if the constitutional violation we have found was not contrary to clearly established law. As *Ontiveros* explains, in evaluating this prong, "the court must ask whether, at the time of the incident, the law clearly established that such conduct would violate the [constitution]. This inquiry focuses . . . on the specific circumstances of the incident—could an officer have reasonably interpreted the law to conclude that the perceived threat posed by the suspect was sufficient to justify deadly force?" 564 F.3d at 383 n.1 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199–200 (2004)). Indeed, unless the violation is "obvious," there must be relevant case law that "squarely governs" the situation with which the officers were presented and gives "fair notice" that such conduct would violate the law. *Brosseau*, 543 U.S. at 200 n.4, 201; *see also Ontiveros*, 564 F.3d at 383 n.1 ("Excessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity."). These cases do not, however, require what Bridgwater contends – a case with exactly the same facts finding a constitutional violation. Instead, they require that the law clearly set parameters under which an objectively reasonable officer would know what is permissible and what is excessive.[7] *See Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) ("The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2004))); *see also, e.g.*, *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005) ("[T]he issue is not

---

[7] While the officer's subjective mindset is not the question, it is noteworthy that even Bridgwater is not contending he could simply kill Ceballos for holding a knife at his side and not putting it down. Instead, he contends that Ceballos stepped forward and raised the knife and that these actions justified the shooting.

whether prior cases present facts substantially similar to the present case but whether prior cases would have put a reasonable officer on notice that the use of deadly force in these circumstances would violate [the Constitution].")

The cases on deadly force are clear: an officer cannot use deadly force without an immediate serious threat to himself or others. Here, the facts are unclear; was there such an immediate threat? Bridgwater's version of the facts would say "yes," while the other witnesses' versions would say "no." The case presented here is not one where the law is not clearly established but rather one where the facts are not clearly established. As such, summary judgment was improper. Accordingly, we reverse the summary judgment in favor of Bridgwater on qualified immunity grounds as to the § 1983 claims of the Ceballos Family.

### B. Porras and Mull

It is undisputed that Bridgwater's supervisor, Porras, arrived at the scene very shortly before the shooting. The Ceballos Family contends that Porras (1) was directly involved in Bridgwater's violation of Ceballos' constitutional rights because he failed to intervene, and (2) was, as Bridgwater's supervisor, deliberately indifferent to Ceballos's rights. Mull's involvement is even more remote—he was not there, and he is accused simply of not doing enough to prevent the situation by way of training and general supervision.

As to the failure to intervene claim, we have held that "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under [§] 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).

As to the failure to supervise and train claim, we note that § 1983 does not provide for any form of vicarious or respondeat superior liability. *See Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). Instead, liability is proper when "(1) the supervisor either failed to supervise or train the

subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Id.* (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998)).

Even viewing the evidence in the light most favorable to the Ceballos Family, it does not appear that Porras "failed to supervise" Bridgwater, or, if he did, that any constitutional violation followed from that failure. Neither did Porras fail to intervene: the evidence, viewed in the light most favorable to the Ceballos Family, does not show a course of action that Porras could have taken to stop Bridgwater from firing. The situation was tense and developing, and Bridgwater fired without warning. Even in Reyes' version of events, it would have been patently absurd for Porras to have ordered Bridgwater to put down his gun. Less than two minutes transpired between Porras's arrival and the shooting. The Ceballos Family has not created a genuine issue of material fact as to whether Porras had any opportunity to intervene in the situation and prevent Bridgwater from firing, let alone that he acquiesced in the use of force.

Further, the standard of "deliberate indifference" required for supervisor liability to attach is a "stringent" one that is not met here. *See Davis*, 406 F.3d at 381. As we explained in *Davis*, deliberate indifference

> requir[es] proof that a municipal actor disregarded a known or obvious consequence of his action. For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Deliberate indifference requires a showing of more than negligence or even gross negligence. Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity.

*Id.* (quotations, footnotes, and citations omitted). There is no evidence that would support a finding that Porras was actually aware that Bridgwater

presented a risk that Porras chose to disregard. Indeed, there is virtually no evidence that Porras knew of *any* adverse information regarding Bridgwater.

We have previously rejected claims of deliberate indifference for supervisors where other officers actually knew of the shooting officer's propensity for violence and had received citizen complaints regarding the officer. *See id.* at 382. Indeed, the reason that the court previously rejected these purported grounds for liability is that failure to supervise claims require "demonstrat[ion] [of] a *pattern of violations*" that cannot normally be proven on the basis of a single prior incident. *See id.* at 382–33 & n.34. There is no suggestion of a pattern of violations here; the Ceballos Family points to one dissimilar violent incident in Bridgwater's previous employment (of which the Ceballos Family acknowledges Porras was unaware) as well as traffic violations by Bridgwater. Even drawing all inferences in favor of the Ceballos Family, these claims against Porras fail. The district court's grant of qualified immunity to Porras was not error.

Similarly, Mull's actions do not rise to the level required by the demanding standard of deliberate indifference. The Ceballos Family points to the following evidence in opposition to summary judgment as to Mull: (1) Bridgwater's traffic violations, of which Mull knew; (2) Bridgwater's alleged lack of training in handling domestic disputes; and (3) Bridgwater's prior violent incident while employed as a corrections officer, which was not adequately explored during the hiring process. This previous incident did not involve use of deadly force. Even taken together, this evidence does not support a claim of deliberate indifference. "To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is 'obvious and obviously likely to result in a constitutional violation.'" *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)). The information known to Mull—principally

12

Bridgwater's traffic violations—could not have suggested that a constitutional violation was likely to result. The district court did not err in granting Mull summary judgment on qualified immunity.

### C. State Claims Against Bridgwater, Porras, and Mull

The district court also dismissed all of the Ceballos Family's state-law causes of action against the individual defendants for failure to state a claim pursuant to the Texas Tort Claims Act. Under section 101.106(e) of the Texas Civil Practice and Remedies Code, "[i]f a suit is filed under this chapter [*viz.*, the Texas Tort Claims Act] against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." Citing this section, the district court dismissed the state-law claims filed against the individual defendants. "We review a [Federal] Rule [of Civil Procedure] 12(b)(6) dismissal de novo. We must accept all well-pleaded facts as true, and we review them in the light most favorable to the plaintiff." *Piotrowski v. City of Houston*, 51 F.3d 512, 514 (5th Cir. 1995) (quotation omitted).

Under section 101.106(e), a plaintiff must make an "irrevocable" election to sue either the governmental unit or its employees, but not both, whenever suit is brought against such entities. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008). It is irrelevant whether the claim is actually allowed by the Texas Tort Claims Act or not.[8] *Garcia*, 253 S.W.3d at 658–59. The Ceballos Family argues that its claims against the various defendants are made separately by each plaintiff and preclude application of section 101.106(e) against each other; they attempt to distinguish *Garcia* on this basis. While the Ceballos Family may be correct that if one plaintiff chooses to sue both a

---

[8] Many of the Ceballos Family's claims allege intentional torts. The limited waiver of sovereign immunity provided by the Texas Tort Claims Act does not extend to intentional torts. TEX. CIV. PRAC. & REM. CODE § 101.057(2).

municipality and its employees that election should not inure to the detriment of another plaintiff in the same matter, that is definitively not the case in this litigation.  Here, the Ceballos Family jointly sued and alleged the same causes of action and the same facts against the same defendants.  They filed a single complaint through the same attorney.  No one plaintiff has ever acted or been treated separately from another at any point in the proceedings.  *Garcia* therefore controls this case, and the district court did not err in dismissing these claims against Bridgwater, Porras, and Mull.

## IV.  Conclusion

We thus, REVERSE and REMAND the summary judgment granted to Bridgwater on the § 1983 claims and AFFIRM the remainder of the district court's judgment.