# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-40217

MARIA V. PENA; DANIEL PENA; MARIA JULISSA PENA,

       Plaintiffs - Appellants

v.

CITY OF RIO GRANDE CITY, TEXAS; ROSA SALINAS, in her Individual and Official Capacity; LIEUTENANT JOSE SOLIS, in his Individual and Official Capacity; OFFICER HUMBERTO VELA, in his Individual and Official Capacity,

       Defendants - Appellees

United States Court of Appeals
Fifth Circuit

**FILED**

June 8, 2020

Lyle W. Cayce
Clerk

---

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 7:16-CV-00079

---

Before SOUTHWICK, GRAVES, and ENGELHARDT, Circuit Judges.

PER CURIAM:[*]

Maria Peña filed an excessive force action under 42 U.S.C. § 1983 for injuries she sustained when she was tased by Rio Grande City police officers. Peña appeals the district court's adverse summary judgment on the basis of qualified immunity. Because the district court erred in granting summary judgment, we reverse and remand.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 19-40217

## I.

On the morning of June 30, 2014, a Rio Grande City juvenile officer, Humberto Vela, met with the parents of then-seventeen-year-old Maria Julissa Peña (Peña) because Peña and her younger sister had run away from home the prior evening.[1] Although neither girl was suspected of a crime, Peña's parents asked Vela to talk with the girls when they returned home and "scare" them into believing they would be arrested in order to teach them a lesson. Later that afternoon, Peña and her parents[2] returned to the Rio Grande City Police Department and encountered Vela outside. The events that followed, including the circumstances surrounding the tasing, are disputed by the parties.

Peña asserts that when they arrived in the parking lot at the corner of Washington Street and Main Street, her father got out of the vehicle and called over Vela, who was outside of the police department. Vela, however, claims he approached the family car after observing an altercation between Peña and her father. Peña's father instructed her to get out of the car, but she refused because she was scared. Vela, who was standing by the rear driver's side door closest to Peña's father, leaned over and threatened to tase Peña if she did not give him her hands and get out of the car.

In response to Vela's report of a "domestic in progress" and request for assistance, Lieutenant Jose Solis, Officer Rosa Salinas, and Officer Ana Balderas Ramirez exited the police department and approached the car. Although the extent of the interaction between Vela and Peña is disputed, it is

---

[1] Earlier that same morning, at approximately 1:55 a.m., Daniel Peña (Peña's father) filed a missing person report with Rio Grande City Police Officer Alex Rivera in reference to his two juvenile daughters that he reported had been missing since 10:00 p.m. the prior evening. The report, including the missing children's dates of birth and identifying information, was entered into the NCIC/TCIC System.

[2] Peña's cousin's girlfriend was also in the vehicle.

undisputed that Peña was in the backseat of the car and Vela ordered Peña to get out of the car and attempted to handcuff her.  Peña refused.  Peña alleges that she was extremely fearful throughout the encounter, particularly because she had not experienced "problems like this before," because she thought her father brought her to the police department for her to go to jail, and because Vela had his hand on his taser and threatened to tase her if she did not get out of the vehicle.  Soon after the other officers arrived, Peña opened the back passenger car door and ran south down Washington Street toward Mirasoles Street.  Salinas and Solis chased after Peña.  Solis ordered three times for Salinas to tase Peña, and, without stopping to properly aim, Salinas fired her taser at Peña.[3]

The steel taser prongs lodged into Peña's back and scalp.  Peña fell face first and struck the pavement near the stop sign at the corner of Washington and Mirasoles.  Peña suffered significant injuries, including several broken teeth as well as burns, bruises, and lacerations to her nose, lip, chin, cheek, forehead, foot, breast, arms, legs, and knees.  Peña was transported by ambulance to the hospital where she received treatment for her injuries, including stitches in her nose and lip.  Additionally, Peña alleges that she suffers from headaches, loss of memory, and scarring as a result of the incident.

After Peña was discharged from the hospital, she was taken to jail and booked for evading arrest and resisting arrest.  Peña initially sued the city in state court, alleging negligence under the Texas Tort Claims Act, then added claims under 42 U.S.C. § 1983 against the city, Salinas, and Solis, alleging that Salinas and Solis used excessive force to seize her in violation of the Fourth Amendment.  The case was removed to federal court.  The district court denied

---

[3] According to the dispatch notes in the Incident Report, there were 19 seconds between the time Vela called for backup and the time the taser was reported deployed.

No. 19-40217

Peña's motions to amend her complaint, granted the city's motion for judgment on the pleadings, and dismissed her claims against the officers for failure to state a claim without reaching the qualified immunity defense.

On appeal, this court vacated in part and remanded, concluding that the district court erred in disregarding Peña's proposed amended complaint.[4] *Peña v. City of Rio Grande City*, 879 F.3d 613 (5th Cir. 2018). Further, this court held that, because the amended complaint stated plausible claims against Salinas and Solis, the district court should consider in the first instance whether Peña's pleadings survive the officers' qualified immunity defense.

On remand, the district court accepted Peña's amended complaint for filing, denied Peña's motion to strike defendants' motion for summary judgment, and dismissed with prejudice the claims against Vela as barred by res judicata. As to Peña's remaining excessive force claims against Salinas arising out of her use of a taser, and against Solis as a supervisor ordering Salinas to deploy her taser, the district court held that both Salinas and Solis were entitled to summary judgment on the basis of qualified immunity. Peña filed this appeal, challenging only the grant of summary judgment in favor of Salinas and Solis.

## II.

We review summary judgment de novo, applying the same standard as the district court. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence

---

[4] The district court's dismissal of Peña's claim against the city was affirmed. The amended complaint included additional claims against Vela and changed the style of the case to reflect that Plaintiff was no longer a minor.

is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Poole*, 691 F.3d at 627.  A fact is material if its resolution could affect the outcome of the action.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether there are genuine disputes of material fact precluding summary judgment, "all of the evidence introduced and all of the factual inferences from the evidence are viewed in a light most favorable to the party opposing the motion."  *Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  When a defendant moves for summary judgment on the basis of qualified immunity, the court must decide: (1) whether the facts, taken in the light most favorable to the plaintiff, show the officer's conduct violated a constitutional right; and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct so that a reasonable official in the defendant's situation would have understood that his conduct violated that right.  *See Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014).

A court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Tolan*, 572 U.S. at 656. Rather, courts must view the facts and draw reasonable inferences in favor of the nonmovant.  *Id.* at 657; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007) ("In qualified immunity cases, this usually means adopting . . . the plaintiff's

version of the facts."). "If the plaintiff fails at either step, the federal court can grant qualified immunity by addressing either step or both of them." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019).

"When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Graham v. Connor*, 490 U.S. 386, 394 (1989). To prevail on an excessive force claim, Peña must show an injury that resulted directly and only from a clearly excessive use of force, and the excessiveness of which was clearly unreasonable. *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017). Excessive force claims are "evaluated for objective reasonableness based on the information the officers had when the conduct occurred." *Saucier v. Katz*, 533 U.S. 194, 207 (2001).

## III.

In granting summary judgment, the district court found that under the *Graham* factors, Salinas' decision to tase Peña "could be objectively reasonable: Salinas reasonably believed Plaintiff was a misdemeanant who was fleeing arrest and posed a danger to herself and others." However, the court found that, regardless of whether the tasing of Peña constituted excessive force, there is no case directly on point to support the finding that the right was clearly established such that the violation was beyond debate. Specifically, the district court concluded, "given the totality of the circumstances, that Salinas was not on notice that utilizing a Taser to deliver a single charge to prevent [Peña] from running into traffic would constitute excessive force." The court concluded that Solis was also entitled to qualified immunity "for similar reasons." We disagree. The district court's reasoning in granting summary judgment is flawed for several reasons.

As an initial matter, the district court erroneously failed to consider the facts in the light most favorable to Peña and dismissed genuine disputes of material fact as merely "slightly differing." "[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* "The relevant question is whether, taking [Peña's] version of the facts as true, the force used . . . was both excessive to the need and objectively unreasonable." *Autin v. City of Baytown*, 174 F. App'x 183, 185 (5th Cir. 2005). It is irrelevant "whether the force was justified based on the [defendant's] claimed interpretation of the situation at the time." *Id.*

Next, there are a litany of genuine disputed facts material to the reasonableness determination, particularly with regard to the district court's analysis of the *Graham* factors. In excessive force cases, the reasonableness inquiry turns on "whether the totality of the circumstances justified a particular sort of . . . seizure." *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 8). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ." *Id.* at 397. In determining whether the use of force is reasonable, we must assess the totality of the circumstances, "including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (internal quotation marks and citation omitted).

No. 19-40217

Under the first factor, the court found that it was reasonable for Salinas to believe that Peña was a criminal suspect of at least a misdemeanor because it is undisputed that Peña had resisted detainment and was in flight. However, this is largely disputed:  Peña asserts that she did not commit a crime; disputes kicking Vela or any other officer; and points to testimony from the officers that they knew she was not a suspect in any crime.  Further, both Peña and her father deny having an argument or physical altercation at the police department, which Vela explains triggered his attempt to detain Peña.

Moreover, the officers explained that Peña was tased for her own safety—not because she was a criminal suspect of a misdemeanor. Additionally, Vela, Salinas, and Solis all offer contradicting testimony regarding the crime Peña was allegedly suspected of committing.[5]  Salinas and Solis were responding to Vela's report of a domestic disturbance, which provided little reason to believe that Peña was in the process of perpetrating a crime.  *See Samples v. Vadzemnieks*, 900 F.3d 655, 661–62 (5th Cir. 2018).  In sum, there are disputed issues of material fact as to whether an officer in Salinas and Solis' position reasonably believed Peña was suspected of

---

[5] Vela claims that he was initially attempting to detain Peña after observing a struggle between her and her father where she attempted to run into Main Street.  While attempting to detain her to prevent her from running into the street, Vela claims that Peña was resisting by kicking and hitting him, but also concealing her hands behind her back.  Solis identifies Peña's crime as disturbing the peace (a misdemeanor) by arguing with her father, but Solis never saw Peña assault her father, as Vela stated.  Both Salinas and Solis testified that they did not see an argument or struggle between Peña and her father, but rather were informed of the alleged struggle after the incident.  Also, Salinas said the only crime she observed Peña commit was assaulting Vela by kicking him, but later in the deposition suggests that the relevant crime is evading and resisting.  Peña was subsequently booked with resisting and evading arrest, a misdemeanor.  However, Vela was already in the process of arresting Peña before she allegedly resisted.  "A person cannot be convicted of evading detention unless an officer had reasonable suspicion or probable cause to detain the suspect for a crime other than evading arrest." *Zimmerman v. Cutler*, 657 F. App'x 340, 344 (5th Cir. 2016).  There is no indication in the record that any charges against Peña were prosecuted.

committing a crime at the time the use of force was employed, in addition to disputes regarding the severity of any such potential misdemeanor crime. Regardless, the severity of the crime, if any, was minimal militating against the use of force. *See Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017); *see also Reyes v. Bridgwater*, 362 F. App'x 403, 407 n.5 (5th Cir. 2010).

The second *Graham* factor (whether Peña posed "an immediate threat to the safety of the officers or others") is equally disputed—but also weighs in favor of Peña. *Graham,* 490 U.S. at 396. The officers assert that it was necessary to tase Peña to protect her from nearby traffic, alleging that they saw a vehicle on Mirasoles Street at the intersection Peña was approaching on foot.[6] However, viewing the facts in the light most favorable to Peña it is not clear that a reasonable officer would have perceived such a danger.

First, Peña testified that she did not see any vehicles ahead and had no intention of running into traffic. Further, there is no record evidence Peña had threatened to hurt herself, was suicidal, or otherwise was a danger to herself. *Cf. Cantrell v. City of Murphy*, 666 F.3d 911, 923 (5th Cir. 2012). Nor does the location of the tasing tend to support the officers' asserted perceived threat. Peña was immediately adjacent to a sidewalk and several feet from Mirasoles Street—a residential street with a speed limit of 20 miles per hour.

We reject the district court's unsubstantiated conclusion that it was objectively reasonable for Salinas and Solis to believe that Peña posed a danger to herself or others based on a purported fear that the teenager would run into traffic when she reached the end of the street. Importantly, Salinas and Solis admit that Peña never threatened to harm herself or anyone else and that they

---

[6] Curiously, Salinas did not include this fact in her report, which she admits was a "significant" omission. Additionally, there is a discrepancy in Salinas' reports of whether she stopped and aimed before deploying her taser.

did not feel threatened at any point.  Because Peña posed a minimal safety threat, if any, it is certainly questionable that a reasonable officer would believe that tasing a teenager running on concrete was necessary for her own safety.[7]

Moreover, the known risks of secondary injury inherent in tasing a person in motion and the department policy cautioning against such use further places the degree of force used under these circumstances outside the bounds of reasonable conduct.[8]  Here, Peña and Salinas were both running when Solis ordered Salinas to tase Peña.  In compliance with Solis's order, Salinas deployed her taser without stopping to aim.  As a result, a barb lodged in Peña's head and another in her back, causing her to fall and sustain significant injuries.

At minimum, the summary judgment evidence refutes the belief that it was necessary to tase Peña to prevent her from getting hit by a car.[9] Additionally, there is no evidence Peña posed a threat to the safety of the officers or others: at no point was she thought to be armed and never

---

[7] While our focus is objective rather than subjective, it is noteworthy that even Salinas did not believe it was necessary to tase Peña because she thought she would be able to catch up to her; instead, she claims she only deployed her taser in accordance with Solis' command.

[8] Salinas testified that it is a violation of department policy to tase a person that is running away or in motion because he or she is no longer a threat.  Similarly, Solis admits that under certain circumstances, tasing a person while running is prohibited.  According to Salinas the department policy only permits tasing someone in motion if he or she is committing or are going to commit a felony.  However, the crimes officers assert they suspected Peña to have committed were all misdemeanors.

Salinas and Solis both acknowledged that a taser can cause death or serious injury. Solis was advised of the warnings about not tasing people in the head and not tasing someone who is running because they could fall and suffer secondary injuries, such as an impact injury to the head or other area.

[9] Besides, "where a seizure's sole justification is preventing harm to the subject of the seizure, the government has little interest in using force to effect that seizure.  Rather, using force likely to harm the subject is manifestly *contrary* to the government's interest in initiating that seizure." *Estate of Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 901 (4th Cir. 2016).

threatened to harm anyone. Under the particular facts of this encounter, a jury could find that the officers had no reason to think Peña posed an immediate threat to herself or anyone else.

The factual disputes cited in the first factor equally apply—and preclude resolution by summary judgment—as to the third factor, whether Peña was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. Additionally, we find that there is a factual dispute as to the nature of Peña's resistance. *See Trammel*, 868 F.3d at 341 ("Where an individual's conduct amounts to mere 'passive resistance,' use of force is not justified."). According to Peña, her only physical resistance prior to being tased was her refusal to give Vela her hands and get out of the car. Such minimal resistance does not warrant the degree of force used. *See id.* (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (plaintiff pulling arm away from an officer after the officer grabbed the plaintiff's arm was only minimal resistance, if at all, and did not justify two officers tackling the plaintiff)). While she does not dispute running away from the officers, Peña disputes that the officers were lawfully attempting to arrest or detain her in the first place. *See Goodson*, 202 F.3d at 736–40 (declining to extend qualified immunity to two officers on an excessive force claim in part because material issues remained as to whether the officers had reasonable suspicion to detain Goodson or probable cause to arrest him); *see also Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009); *see also Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (Force—irrespective of degree—is only permissible to the extent that is actually needed to effectuate an arrest or stop.).

If Peña's allegations are accepted by the trier of fact as true, the incident involved an unarmed, teenage girl who neither threatened the officers, herself, nor anyone else, nor was a suspect in a crime or had any criminal record. She

was driven to the police department by her parents after she failed to come home the night before. Upon arriving on the scene, Vela immediately threatened to tase Peña for not getting out of her parents' car and attempted to place her in handcuffs for reasons unknown to her. Vela admits he did not have probable cause to arrest Peña at this point. According to Peña, she hid her hands out of fear and attempted to run because she was "really scared." Peña was not given any other commands other than to get out of her parents' car. Peña was not told that she was under arrest or why she was being ordered out of the car. Once Peña was running, the officers did not order her to stop or warn her that she would then be tased.

Solis, Salinas' supervisor and highest ranking officer at the scene, commanded Salinas three times to tase Peña. Salinas acknowledged that she is instructed to follow her supervisor's directives and that Solis was the one who made the decision to tase Peña. While running behind Peña and without stopping to aim, Salinas tased Peña.

The speed with which an officer resorts to force, *Trammell*, 868 F.3d at 342, and the failure of the officer "to use physical skill, negotiation, or even commands" before applying such force, *Newman v. Guedry*, 703 F.3d 757, 762 (5th Cir. 2012), weigh in favor of finding that the use of force was excessive to the need. Here, without warning or ordering her to stop, Salinas deployed her taser, which according to one report occurred within 19 seconds of Vela's call for assistance. In determining the objective reasonableness of the officer's use of force, it is also relevant that Peña was seventeen years old and five feet two inches tall. *See Autin*, 174 F. App'x at 185.

Applying the *Graham* analysis to the facts and circumstances in the light most favorable to Peña, we are not convinced at this juncture that the degree of force used was objectively reasonable. *Graham*, 490 U.S. at 396. Instead, a

jury could reasonably find that Salinas and Solis violated Peña's Fourth Amendment right to be free from excessive force.[10]   "By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly weighed the evidence and resolved disputed issues in favor of the moving party." *Tolan*, 572 U.S. at 657.  Peña has established genuine disputes of material fact regarding whether the officers' use of force was excessive and objectively unreasonable.[11]   Resolving those disputed facts in her favor, we conclude that Peña has sufficiently shown that a jury could conclude that the level of force the defendants used against her was unreasonable in relation to the threat that she presented and the surrounding circumstances, violating her right to be free from excessive force.

Nevertheless, defendants are entitled to qualified immunity unless the right, defined at a fact specific level, was clearly established at the time of the violation.  *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).  "A clearly established right is one that is 'sufficiently clear that every reasonable officer

---

[10] "A supervisory official may be held liable . . . if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).  Peña asserts that Solis, Salinas' supervisor and highest ranking officer at the scene, affirmatively participated in the constitutional violation by ordering Salinas to tase Peña.  "A superior officer issuing a direct order to a subordinate to use excessive force demonstrates both the necessary action and causality for a supervisor-liability claim." *Peña*, 879 F.3d at 621.

"Separate consideration does not require courts to conduct a separate analysis for each officer in those cases where their actions are materially indistinguishable, it merely requires them to consider each officer's actions." *Meadours v. Ermel*, 483 F.3d 417, 422 n.4 (5th Cir. 2007).

[11] Moreover, Peña offered evidence that a reasonable jury could find undermines the officers' credibility.  "Summary judgment is not appropriate when questions about the credibility of key witnesses loom . . .  and the evidence could permit the trier-of-fact to treat their testimony with skeptical scrutiny." *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) (internal quotation and citation omitted); *see also Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) ("Summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant's witnesses.").

would have understood that what he is doing violates that right.'" *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted).

The Supreme Court has consistently instructed lower courts not to define the applicable "clearly established law" at a "high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The pertinent inquiry is "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation [he or she] confronted.'" *Mullenix*, 136 S. Ct. at 309 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). Again, we must view the summary judgment evidence in the light most favorable to Peña in assessing whether the officers' actions violated clearly established law. *Tolan*, 572 U.S. at 657. Correspondingly, "courts must take care not to define a case's context in a manner that imports genuinely disputed factual propositions." *Id.*

A "constitutional violation can be 'clearly established' even when there is no materially similar precedent." *Zimmerman*, 657 F. App'x at 346 (citing *Hope*, 536 U.S. at 741). "[I]n an obvious case the *Graham* excessive-force factors themselves can clearly establish the answer, even without a body of relevant case law." *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (internal quotation marks omitted)). Nevertheless, the unlawfulness must be apparent in light of pre-existing law. *White*, 137 S. Ct. at 552.

The *Graham* excessive-force factors do not justify Salinas' tasering Peña under the circumstances.  Instead, as analyzed above, a reasonable jury could infer that the *Graham* factors counsel against the force used against Peña.  On Peña's account, she was not suspected of a crime, objectively posed no threat to anyone's safety, and did not actively resist a lawful arrest.  On these facts, a reasonable officer would have known that the degree of force used against Peña was unconstitutionally excessive.  *See Deville*, 567 F.3d at 167–69 ("Officers must assess not only the need for force, but also the relationship between the need and the amount of force used. . . . it was clearly established in August 2005 that the amount of force that the officers could use depended on [the *Graham* factors]."); *see also Bone v. Dunnaway*, 657 F. App'x 258, 263–64 (5th Cir. 2016) ("[T]here is a genuine dispute as to whether any *Graham* factor justified Jones's use of force, and therefore, whether Jones's force violated Bone's constitutional rights.  [T]his same factual dispute prevents us from answering the question [of 'clearly established law'] in [the officer's] favor at summary judgment.").

We denied qualified immunity under comparable circumstances in *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012).  In *Newman v. Guedry*, we held that the officers use of force during a traffic stop was objectively unreasonable under the circumstances based on our analysis of the *Graham* excessive-force factors.  *Id.* at 761–63.  The court rejected the officers' contention that their use of force was reasonable despite their assertions that Newman resisted arrest, that he struggled and was noncompliant, that he reached for his waistband, potentially for a weapon, and that their actions were necessary to prevent serious injury or death to themselves.  *Id.* at 762.  To the contrary, Newman, the passenger of the stopped vehicle, denied that he

resisted the officers or failed to comply with any commands; rather, he alleged that the officers used force in response to an off-color joke. *Id.*

As to the severity of the crime, the court reasoned that although the officers asserted that Newman violated Texas Penal Code § 38.03—Resisting Arrest, Search, or Transportation—because a struggle ensued, the undisputed facts did not demonstrate that Newman resisted search and arrest. *Id.* On Newman's account, the officers shoved, hit, and tased him after he made an off-color joke, denying that he grabbed the officer's hand. *Id.* Next, the court found the officers' theory that they were trying to prevent serious injury or death to themselves "severely overwrought" and not supported by the video evidence. *Id.* at 762. Instead, while recognizing that traffic stops may be dangerous encounters, the court concluded that the "particular facts of [the] encounter did not justify treating Newman as a serious threat, at least at the summary-judgment stage." *Id.* at 762–63. Finally, the court weighed the fact that Newman did not attempt to flee and allegedly was never given any commands that he disobeyed. *Id.* at 763. Moreover, we considered it pertinent that the officers immediately resorted to using the taser and nightstick "without attempting to use physical skill, negotiation, or even commands," in concluding that the use of force was objectively unreasonable. *Id.*

Ultimately, we held that the officer's use of a taser was objectively unreasonable because the plaintiff committed no crime, posed no threat to anyone's safety, and did not resist the officers. *Id.* at 762–64. Because, on Newman's account, none of the *Graham* factors justified the officer's tasering Newman, the court held that the officers' conduct was objectively unreasonable in light of clearly established law at the time of the incident (in 2007). *Newman*, 703 F.3d at 763–64; *see also Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) ("[I]t is clearly established that force is least justified

against nonviolent misdemeanants who do not flee or actively resist arrest and pose little to no threat to the security of the officers or the public.").

Similarly, we have held the use of a taser was excessive to the need and objectively unreasonable in cases involving minor, non-violent crimes, in which the suspect posed no objective threat, and was not resisting or attempting to evade arrest. *See Autin,* 174 F. App'x at 186 (affirming denial of qualified immunity to officer who tased the suspect in the back, reasoning that the suspect "was at most committing the minor crime of criminal mischief," was holding a brick, but was "objectively unthreatening," and was not resisting arrest).

For example, in *Massey v. Wharton*, 477 F. App'x 256 (5th Cir. 2012), we affirmed the denial of qualified immunity on an excessive force claim because no reasonable officer would believe the force used against Massey to be reasonable under the totality of the circumstances. *Id.* at 263. There, we reasoned that, taking the plaintiff's assertions as true, "Massey was arrested for disorderly conduct and resisting arrest although he was attempting to comply with the officers' commands, he was not a threat to the officers or others, and he was not attempting to flee, but was driving away at the command of Wharton." *Id.* at 263. The court concluded that "in light of *Autin*" and because none of the "clearly established *Graham* factors" supported Wharton, no reasonable officer would believe it reasonable to tase Massey twice and pepper spray him to subdue him. *Id.* Thus, the officer was not entitled to qualified immunity on Massey's excessive force claim. *Id.*

Our prior decisions, despite factual differences, provide sufficiently specific guidance to put the officers on notice that their conduct was unlawful. If Peña's version of the events is true, no reasonable officer under the circumstances Salinas and Solis confronted would have believed it was

reasonable to tase Peña—a juvenile girl who was not suspected of a crime, posed no objective threat to the safety of the officers' or others, and was not actively resisting arrest—without warning and without attempting to use any intermediate measures of force.[12] *See Newman*, 703 F.3d at 766; *cf. Poole*, 691 F.3d at 629 (holding that officers who "responded with 'measured and ascending' actions that corresponded to Poole's escalating verbal and physical resistance" were entitled to qualified immunity). Given the material factual disputes in this case, we cannot resolve the qualified immunity question in the officers' favor at summary judgment. *See Bone*, 657 F. App'x at 264.

It is not the law that is not clearly established, rather in this case the facts are not clearly established. However, viewing the facts in the light most favorable to Peña at the summary judgment stage, the officers' conduct was objectively unreasonable in light of clearly established law at the time of the incident. Accordingly, the district court erred in granting summary judgment on qualified immunity grounds.

Additionally, Peña asserts on appeal that this matter should be assigned to a different judge on remand because the district court had difficulty overcoming the fact that her previous findings had been overruled, failed to apply the appropriate summary judgment standard, and is not impartial. The

---

[12] *Zimmerman v. Cutler*, 657 F. App'x 340 (5th Cir. 2016), is not dispositive of our clearly established analysis because it is non-precedential and distinguishable on its facts. Unlike *Zimmerman* where the officers "reasonably suspected Zimmerman of committing several offenses," Peña offers evidence disputing that the officers were arresting her or attempting to seize her for any recognized and lawful reason. Appellees' assert that Vela had probable cause to arrest Peña for disorderly conduct based on Vela's testimony, however the alleged altercation he observed is directly disputed by the testimony of both Peña and her father and was not observed by either Salinas or Solis. Further contrasting *Zimmerman*, the officers assert that Peña was tased for her own safety—not to make an arrest or investigatory stop. Finally, *Zimmerman* is distinguishable because the suspect was an adult male outside of a bar at 2:00 a.m. who was seen facing another man in a confrontational manner in the middle of the street.

power to reassign a case to another judge on remand "is an 'extraordinary' power that is 'rarely invoked.'" *United States ex rel. Little v. Shell Expl., Prod. Co.*, 602 F. App'x 959, 975 (5th Cir. 2015). Because the circumstances presented do not evince impartiality or otherwise warrant reassignment, we decline to invoke our extraordinary power and deny reassignment.[13]

## IV.

On the factual allegations as we must take them for purposes of this motion, the officers' use of force against Peña violated clearly established law. Of course, at trial, Peña will bear the burden of proving the many facts and inferences that we assume in her favor. Whether the officers are ultimately protected by qualified immunity or are liable will depend on the facts proven at trial and the inferences drawn by the jury.

For these reasons, we conclude that the district court erred in granting summary judgment on the basis of qualified immunity as to Peña's excessive force claims against Salinas and Solis. Accordingly, we reverse and remand for further proceedings consistent with this opinion. Appellant's request for reassignment on remand is denied.

---

[13] The district judge described this court's prior opinion as "inaccurate," "incorrect," "contradictory," "unclear," "an irreconcilable contradiction," and "a mischaracterization" of the district court opinion. Despite this unnecessary criticism, it is nonetheless rudimentary that an appellate court is charged with the authority to review the decisions of district courts, and reverse them when they err.